UNITED STATES of America,
Appellant,

v.

CITY AND COUNTY OF DENVER, acting By and Through its BOARD OF WATER COMMISSIONERS et al., Appellees.

CITY AND COUNTY OF DENVER, a municipal corporation of the State of Colorado, acting By and Through its BOARD OF WATER COMMISSIONERS, Appellants,

v.

UNITED STATES of America, et al., Appellees.

Nos. 79SA99, 79SA100.

Supreme Court of Colorado, En Banc.

Nov. 29, 1982.

Rehearings Denied Jan. 10, 1983.

**2**

James M. Moorman, Asst. Atty. Gen., Joseph Dolan, U.S. Atty., Denver, Peter R. Steenland, Jr., Robert L. Klarquist, Joshua I. Schwartz, Attys., Dept. of Justice, Washington, D.C., Hank Meshorer, Senior Trial Atty., Dept. of Justice, Land and Natural Resources Div., Denver, for the United States.

Wayne D. Williams, Gen. Counsel, Michael Walker, Asst. Atty., Saunders, Snyder, Ross & Dickson, P.C., Glenn G. Saunders, Jack F. Ross, Sp. Counsel, Denver, for the City and County of Denver, acting by and through its Bd. of Water Com'rs.

Moses, Wittemyer, Harrison & Woodruff, P.C., Raphael J. Moses, Charles N. Woodruff, Boulder, for Colorado-Ute Electric Ass'n, Inc.; Union Oil Co. of California; Vail Water and Sanitation Dist.

Fischer, Brown, Huddleson & Gunn, Ward H. Fischer, Fort Collins, for Jackson County Water Conservancy Dist.; Water Supply and Storage Co.; City of Fort Collins; Colorado Cattlemen's Ass'n; and Various Protestants.

Delaney & Balcomb, Kenneth Balcomb, Scott Balcomb, Boulder, for Colorado River Water Conservation Dist.; Benton Land & Livestock Co.; Sam Kinnamon and Ross S. Sheeler as trustees of K/K Ranch; L.E. Phillips; Ross Wheeler; Mary Wheeler Floyd, d/b/a YZ Cattle Co.; Raymond D. Sloan; Beverly D. Sloan; Jack Oleson; West Divide Water Conservancy Dist.

Steinmark & Lawrence, Kim R. Lawrence, Greeley, for Central Colorado Water Conservancy Dist.

Baker & Cazier, Stanley W. Cazier, Granby, for High Country Ranches, Inc.; Charles Glenn, Sheriff; Grand County Water and Sanitation Dist. No. 1; Charles B. Clayton; Elsie J. Clayton; and Middle Park Water Conservancy Dist., amicus curiae.

Holland & Hart, John U. Carlson, Paul D. Frohardt, Denver, for Twin Lakes Reservoir and Canal Co.; Atlantic Richfield Co.

Horn, Anderson & Johnson, Louis Johnson, Colorado Springs, for the City of Colorado Springs.

Kelly, Stansfield & O'Donnell, Timothy J. Flanagan, Denver, for Public Services Co. of Colorado.

Sherman & Howard, Don H. Sherwood, Gary L. Greer, Theodore E. Worcester, Wendy J. Busch, Denver, for New Jersey Zinc Co.

Welborn, Dufford, Cook & Brown, William C. Robb, Denver, for Utah Intern. Inc. and CF&I Steel Corp., amicus curiae.

Seraphine, Bratton & Alexander, L. Richard Bratton, Gunnison, for Upper Gunnison River Water Conservancy Dist.

Bruce G. Miller, Denver, for the City of Frisco.

Nelson, Hoskin, Groves & Prinster, P.C., Gregory K. Hoskin, Grand Junction, for Algernon B. Reese III; George and Margaret Volk; Austin and Margo Keiser; Union Carbide Corp.; Anderson Hereford Ranch, Inc.; Andrews Development, Inc.; Big Creek Reservoir Co.; Blue Stone Ditch Co.; Bull Creek Reservoir Canal and Power Co.; Coolbran Conservancy Dist.; Cottownwood Lakes Reservoir Co.; John V. Cuddy; W.R. Lloyd; Mesa Lakes Reservoir Co.; Mesa Water Works Co.; Morman Mesa Ditch Co.; Palisade Irrigation Dist.; Panorama Improvement Dist.; Ival & Ed Young, Inc.; Sommerville Cattle Co.; Hitchborn Livestock Co.; James Golden Bair.

Dufford, Waldeck & Williams, Donald J. Dufford, William G. Waldeck, Grand Junction, for City of Grand Junction; J. Perry Olsen; Pittsburg & Midway Coal Mining Co.; Mary Scott; Joseph T. Zoline.

Klingsmith & Associates, P.C., P.C. Klingsmith, Gunnison, for Crested Butte Water and Sanitation Dist.; Town of Crested Butte; Soderquist Ranches, Inc.; Dos Rios Ranches, Inc.; Town of Lake City; Corp. of the Rocky Mountain Biological Laboratory at Gothic.

Maynes, Bradford & Duncan, Frank Maynes, Sara Duncan, Durango, for Southwest Water Conservancy Dist.; San Miguel Water Conservancy Dist.

Berkowitz, Berkowitz & Brady, Margaret L. Devanney, Denver, for The Sierra Club, The Nat. Wildlife Federation, The Colorado Wildlife Federation; The Environmental Defense Fund; and The National Audobon Society, amici curiae.

Native American Rights Fund Richard B. Collins, Boulder, for Southern Ute and Ute Mountain Ute Indian Tribes, amici curiae.

Floyd K. Murr, Walsenburg, for Huerfano County Water Conservancy Dist., amicus curiae.

Mitchell & Mitchell, P.C., Rexford L. Mitchell, Rocky Ford, for Arkansas Valley Ditch Ass'n; Catlin Canal Co.; Highline Canal Co., amici curiae.

Quiat, Dice & Associates, Robert F.T. Krassa, Pueblo, for Pueblo West Metropolitan Dist.; St. Charles Mesa Water Ass'n, amici curiae.

J.D. MacFarlane, Atty. Gen., Richard F. Hennessey, Deputy Atty. Gen., Mary J. Mullarkey, Sol. Gen., Dennis M. Montgomery, David Aschkinasi, John C. Ohrenschall, Asst. Attys. Gen., Denver, for the State of Colo.; Game, Fish and Park Dept.; Ralph Kelling, Div. Engineer, Water Div. No. 4; Lee Enewold, Div. Engineer, Water Div. No. 5; G.I. Buffham II, Div. Engineer, Water Div. No. 6.

Davis, Graham & Stubbs, John M. Sayre, Donald E. Phillipson, Denver, for Northern Colorado Water Conservancy Dist.; Municipal Subdistrict, Northern Colorado Water Conservancy Dist.

Fairfield & Woods, Charles J. Beise, Howard Holme, Denver, for Southeastern Colorado Water Conservancy Dist.

ERICKSON, Justice.

In these consolidated appeals by the City and County of Denver, acting by and through its Board of Water Commissioners (Denver), and the United States of America (United States or federal government), we must determine whether the federal government has any reserved water rights incident to its reservation of certain lands for forest, national monument, or other purposes in Water Divisions 4, 5, or 6 in western Colorado; and, if so, whether the decrees entered in the District Courts in and for Water Divisions 4, 5, and 6 (water court) correctly determined the extent of the reserved rights. The water court held

that federal reserved water rights must be recognized in connection with certain reservations of land from the public domain, but that the rights of the United States were less extensive than the federal government asserted. We affirm in part and reverse in part and remand this case to the water court with directions to modify its decree in accordance with the views expressed in this opinion.

I.

LEGAL FRAMEWORK

These complex appeals involve the adjudication and integration of the reserved water rights asserted by the federal government into the water rights systems of the Colorado, Gunnison, North Platte, White, and Yampa River Basins in Colorado. In seeking to invoke the reserved rights doctrine as a basis for its claimed water rights, the United States seeks to proceed outside Colorado's prior appropriation system for the adjudication of water rights. The integration of the competing legal theories into a common, rational, and comprehensive system of water distribution marks a reconciliation between two fundamental themes in the development of this State.[1]

The first is the role of the United States as the sovereign and proprietor of the territory which became the State of Colorado in 1876. *See Kleppe v. New Mexico,* 426 U.S. 529, 96 S.Ct. 2285, 49 L.Ed.2d 34 (1976). The federal government was the original owner of substantially all the land that

---

1. From our earliest history, the General Assembly in Colorado has encouraged adjudication of water rights in order to preclude future controversies and to afford security to those who labored to build a society here. Colorado's first irrigation statutes reflect this purpose. *See* Act of February 19, 1879, Colo.Sess.Laws 94; Act of February 23, 1881, Colo.Sess.Laws 142. The Act of April 11, 1902, Colo.Sess.Laws ch. 130 § 1, extended the benefits of adjudication from irrigation purposes to all beneficial uses. The Water Adjudication Act of 1943, C.R.S.1963, 148–9–7 *et seq.,* and the Water Right Determination and Administration Act of 1969, sections 37–92–101 *et seq.,* successively

refined and recodified adjudication procedures to meet the needs of the water users in Colorado. In all of the aforementioned acts, there is a consistent objective: through adjudication procedures, competitors for water fix their relative priorities and the public water officials thereafter allocate water in order of priority. Moreover, the underlying purpose of the federal joinder in Colorado adjudication proceedings is to afford a forum for the reconciliation of competing theories and claims to result in a predictable and reliable system of water allocation. *See Colorado River Water Conservation District v. United States,* 424 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976).

comprised the western territories. The acts admitting the western territories into the United States, which guaranteed each state "equal footing" with the original states, reserved ownership of unappropriated lands within the state to the federal government but made no provision with respect to unappropriated waters.[2] *See, e.g., California v. United States,* 438 U.S. 645, 98 S.Ct. 2985, 57 L.Ed.2d 1018 (1978). Much of the land originally owned by the federal government has been sold or disposed of under the terms of the federal public land laws,[3] though the federal government still holds title to substantial acreage in the West.[4]

The lands owned by the federal government are generally classified as either "public domain" or "reserved" lands. The public domain includes lands open to settlement, public sale, or other disposition under the federal public land laws, and which are not exclusively dedicated to any specific governmental or public purpose. *See, e.g., Federal Power Commission v. Oregon,* 349 U.S. 435, 75 S.Ct. 832, 99 L.Ed. 1215 (1955); *United States v. Minnesota,* 270 U.S. 181, 46 S.Ct. 298, 70 L.Ed. 539 (1926). Public domain lands are, for the most part, managed by the United States Department of the Interior through its Bureau of Land Management.[5] Reserved lands are those that have been expressly withdrawn from the public domain by statute, executive order, or treaty, and are dedicated to a specific federal purpose. Pursuant to the authority vested in the United States by Article IV, Section 3 of the United States Constitution,[6] Congress has frequently acted to reserve or withdraw lands from the public domain or to empower the President or his delegate to do so. *See United States v. New Mexico,* 438 U.S. 696, 98 S.Ct. 3012, 57 L.Ed.2d 1052 (1978); *United States v. Midwest Oil Co.,* 236 U.S. 459, 35 S.Ct. 309, 59 L.Ed. 673 (1915). Among these reservations are national forests, national parks, national monuments, public springs and waterholes, and public mineral hot springs. The reservations directly at issue in this adjudication are:

(1) Arapaho National Forest;

*United States v. New Mexico,* 438 U.S. 696, 98 S.Ct. 3012, 57 L.Ed.2d 1052 (1978).

**2.** Title to most of the western territories was obtained by the United States from foreign powers through purchase and treaty during the first half of the nineteenth century. Generally, the terms of acquisition provided for recognition of the few existing private property rights, but granted title over the vast non-private lands to the United States. Texas was an exception; it was admitted by annexation in 1845, and retained title to all its public lands. *See* Morreale, *Federal-State Conflicts Over Western Waters—A Decade of Attempted "Clarifying Legislation,"* 20 Rutgers L.Rev. 423 (1966); Note, *Federal-State Conflicts Over the Control of Western Waters,* 60 Colum.L.Rev. 967 (1960).

**3.** *See, e.g.,* Homestead Act of May 20, 1862, 43 U.S.C. §§ 161 *et seq.* (1976); Desert Land Act of 1877, 43 U.S.C. §§ 321 *et seq.* (1976); Act of August 18, 1894, 43 U.S.C. §§ 641 *et seq.* (1976); Public Lands Act of 1964, 43 U.S.C. §§ 1391 *et seq.* (1976); Federal Land Policy and Management Act, 43 U.S.C. §§ 1701 *et seq.* (1976).

**4.** In 1978, the United States Supreme Court declared that the percentage of federally-owned land in the western states, excluding Indian reservations and trust properties, ranged from 29.5% of the land in the State of Washington to 86.5% of the land in the State of Nevada, with an average of approximately 46%. *See*

**5.** The two major statutes authorizing management of the public domain by the Bureau of Land Management are the Taylor Grazing Act, 43 U.S.C. §§ 315 *et seq.* (1976), which authorizes the Secretary of the Interior to manage the public domain for grazing purposes, and the Federal Land Policy and Management Act, 43 U.S.C. §§ 1701 *et seq.* (1976), which directs the Secretary of the Interior to manage the public domain on the basis of "multiple uses" and for "sustained yields." 43 U.S.C. §§ 1702(c), (h) (1976). *See generally* Coggins, *Of Succotash Syndromes and Vacuous Platitudes: The Meaning of "Multiple Use, Sustained Yield" for Public Land Management,* 53 U.Colo.L.Rev. 229 (1982); Coggins, *Multiple Use, Sustained Yield Planning on Public Lands,* 53 U.Colo.L.Rev. 411 (1982).

**6.** Article IV, Section 3 of the United States Constitution provides in pertinent part:

"The Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States; and nothing in this Constitution shall be so construed as to Prejudice any Claims of the United States, or of any particular State."

(2) Grand Mesa National Forest;

(3) Gunnison National Forest;

(4) Manti-La Sal National Forest;

(5) Routt National Forest;

(6) Uncompahgre National Forest;

(7) White River National Forest;

(8) Rocky Mountain National Park;

(9) Black Canyon of the Gunnison National Monument;

(10) Colorado National Monument;

(11) Dinosaur National Monument;

(12) approximately 1,500 public springs or waterholes located upon federally owned public domain lands managed by the Bureau of Land Management;

(13) two mineral hot springs located upon federally owned public domain lands.

These reserved federal lands may require the availability and use of water to accomplish important national objectives, and the United States has made use of the waters arising on or flowing over its reserved lands in Colorado for many years.

The other fundamental theme of Colorado's development essential to the disposition of these appeals is this State's leading role in the development of the doctrine of prior appropriation which generally governs, in one form or another, the acquisition of water rights in the nineteen western states.[7] *See California v. United States, supra;* F. Trelease, *Water Law* 11 (3d ed. 1979). An essential purpose of the systematic distribution of water under Colorado law is to secure an orderly and stable society. *See People v. Higgins,* 67 Colo. 441, 184

---

**7.** The nineteen western states are Alaska, Arizona, California, Colorado, Hawaii, Idaho, Kansas, Montana, Nebraska, Nevada, New Mexico, North Dakota, Oklahoma, Oregon, South Dakota, Texas, Utah, Washington, and Wyoming.

**8.** Land is generally considered arid or semi-arid if it cannot be cultivated without irrigation. *See* Note, *Federal-State Conflicts Over the Control of Western Waters,* 60 Colum.L.Rev. 967 (1960).

**9.** The United States Supreme Court traced this history in *California v. United States,* 438 U.S. 645, 98 S.Ct. 2985, 57 L.Ed.2d 1018 (1978), and declared:

---

P. 365 (1919). Because of our semiarid climate,[8] an orderly and stable legal system for the right to use water has always been a paramount concern of the people of this State and, historically, the Colorado doctrine of prior appropriation grew and developed to meet the stark necessities of our environment. *See, e.g., Coffin v. Left Hand Ditch Co.,* 6 Colo. 443 (1882); *Schilling v. Rominger,* 4 Colo. 100 (1872); *Yunker v. Nichols,* 1 Colo. 551 (1872).

The appropriation doctrine arose from the customary uses of the early settlers—most notably miners—of the Colorado Territory. *See Broder v. Natoma Water & Mining Co.,* 101 U.S. 274, 25 L.Ed. 790 (1879); *Jennison v. Kirk,* 98 U.S. 453, 25 L.Ed. 240 (1878); *Atchison v. Peterson,* 87 U.S. (20 Wall.) 507, 22 L.Ed. 414 (1879); *Basey v. Gallagher,* 87 U.S. (20 Wall.) 670, 22 L.Ed. 452 (1875). From Colorado's earliest history, the people did not wait for the federal government to devise a perfect legal system for the occupation of the frontier. As physical conditions differed markedly west of the 100th Meridian, the pioneers diverted water from streams for consumption in mining and irrigation projects and dewatered streams in a way utterly foreign to the Eastern riparian tradition.[9] As this Court held in *Coffin v. Left Hand Ditch Co., supra:*

"Imperative necessity, unknown to the countries which gave it birth, compel[led] the recognition of another doctrine in conflict therewith. . . . [T]he first appropriator of water from a natural stream for a beneficial purpose has, with the

---

"The settlers in this new land quickly realized that the riparian doctrine of water rights that had served well in the humid regions of the East would not work in the arid lands of the West."

438 U.S. at 653, 98 S.Ct. at 2990. A riparian system was particularly ill-suited for use by the first miners in Colorado, who staked their claims at a time when most of the western lands were owned by the federal government and were not legally open to settlement. Thus, for the most part, there was no private ownership of land to which riparian rights could attach. *See supra* note 8.

qualifications contained in the constitution, a prior right thereto, to the extent of such appropriation."

6 Colo. at 447. Against this background, the Colorado doctrine of prior appropriation for surface water was first established. *See generally* 2 C. Kinney, *Law of Irrigation* §§ 632–34 (2d ed. 1912); S. Weil, *Water Rights in the Western States* §§ 34–35 (2d ed. 1908). A complex society and economy have since flourished here in reliance on a comprehensive legal system for the allocation of water rights; and municipalities, agriculture, and industry throughout Colorado all depend upon the continued existence and availability of water from the rivers of this State.

Notwithstanding its ownership of water forming a part of the public domain, the United States for a period of years silently acquiesced in the creation of private appropriative rights in water on the public domain under customary local uses. *See California-Oregon Power Co. v. Beaver Portland Cement Co.*, 295 U.S. 142, 55 S.Ct. 725, 79 L.Ed. 1356 (1935); *Atchison v. Peterson, supra.* When it was confronted with the customary system of water allocation in the West, however, the federal government was relegated to the position of recognizing accomplished facts and, in a series of statutes passed in the last half of the nineteenth century, Congress rejected the alternative of a general federal water law. *See Broder v. Natoma Water & Mining Co., supra.* In 1866, Congress provided statutory protection to water users who had relied upon the customary legal system in the western states for allocating water by prior appropriation. The Act of July 26, 1866 (1866 Act) provided:

> "[W]henever, by priority of possession, rights to the use of water for mining, agricultural, manufacturing, or other purposes, have vested and accrued, and

the same are recognized and acknowledged by the local customs, laws, and the decisions of courts, the possessors and owners of such vested rights shall be maintained and protected in the same; and the right of way for the construction of ditches and canals for the purposes aforesaid is hereby acknowledged and confirmed; ...."

Ch. 262, § 9, 14 Stat. 253 (now codified in 43 U.S.C. § 661 (1976)). Next, the Act of July 9, 1870 made it clear that the rights of patentees of federal lands were subject to the appropriative rights recognized by the 1866 Act:

> "[A]ll patents granted, or preemption or homesteads allowed, shall be subject to any vested and accrued water rights, or right to ditches and reservoirs used in connection with such water rights, as may have been acquired under or recognized by the [1866 Act]."

Ch. 235, § 17, 16 Stat. 218 (now codified in 43 U.S.C. § 661 (1976)). Finally, the Desert Land Act of 1877 reaffirmed the rule that private rights in waters on the public domain were to be governed by the appropriation doctrine: [10]

> "[T]he right to the use of water [by the claimant] shall depend upon bona fide prior appropriation: ... and all surplus water over and above such actual appropriation and use, together with the water of all lakes, rivers and other sources of water supply upon the public lands and not navigable, shall remain and be held free for the appropriation and use of the public for irrigation, mining, and manufacturing purposes subject to existing rights."

Act of March 3, 1877, ch. 107, 19 Stat. 377 (now codified in 43 U.S.C. § 321 (1976)).

By virtue of these acts, Congress determined that water rights on the public domain could be acquired under state law

---

**10.** The Desert Land Act created a new category of federal lands—desert lands—and established a method for purchase of such lands. Desert lands were defined as "lands exclusive of timber lands and mineral lands which will not, without irrigation, produce some agricultural crop." By reclaiming and irrigating such lands, settlers were entitled to purchase desert lands at a nominal price. By its terms, the Desert Land Act of 1877 was not applicable to Colorado. Only by the Act of March 3, 1891, ch. 561, § 2, 26 Stat. 1097, was the Desert Land Act extended to the State of Colorado.

embodying the appropriation doctrine. *California-Oregon Power Co. v. Beaver Portland Cement Co., supra.* It thereby largely acquiesced in comprehensive state control over the appropriation of water, including water on federal lands, at least with respect to rights that could be asserted by private appropriators.[11] The United States Supreme Court has interpreted these acts as expressing congressional recognition of and acquiescence in the water rights law developed by the western states:

> "Congress intended [by these acts] 'to recognize as valid the customary law with respect to the use of water which had grown up among the occupants of the public land under the peculiar necessities of their condition.'"

*California v. United States,* 438 U.S. 645, 656, 98 S.Ct. 2985, 2991, 57 L.Ed.2d 1018, 1027 (1978), *quoting Basey v. Gallagher,* 87 U.S. (20 Wall.) 670, 684, 22 L.Ed. 452, 455 (1875). *See also United States v. Rio Grande & Dam Irrigation Co.,* 174 U.S. 690, 19 S.Ct. 770, 43 L.Ed. 136 (1899). Moreover, the effect of the acts was not limited to recognition of rights that had previously vested under applicable state law or custom:

> "They reach[ed] into the future as well, and approve[d] and confirm[ed] the policy of appropriation for a beneficial use, as

recognized by local rules and customs, and the legislation and judicial decisions of the arid land states, as the test and measure of private rights in and to the non-navigable waters on public domain."

*California-Oregon Power Co. v. Beaver Portland Cement Co.,* 295 U.S. 142, 155, 55 S.Ct. 725, 728, 79 L.Ed. 1356, 1360 (1935).

Until the enactment of the McCarran Amendment,[12] however, the prior appropriation system in Colorado could not be applied to the adjudication or administration of the water rights of the United States, because Congress had not consented to the determination of such water rights by state courts. As sovereign, the United States was privileged to withhold such consent. *See Minnesota v. United States,* 305 U.S. 382, 59 S.Ct. 292, 83 L.Ed. 235 (1939). In *United States v. District Court for Eagle County,* 169 Colo. 555, 458 P.2d 760 (1969), *aff'd,* 401 U.S. 520, 91 S.Ct. 998, 28 L.Ed.2d 278 (1971), this Court noted that the sovereign immunity of the United States created an anomaly in the adjudication of water rights:

> "We have a situation in which the federal sovereign claims water rights which are nowhere formally listed, which are not the subject of any decree or permit and which, therefore, are etheric in large part to the person who has reason to

---

**11.** This deference to state control can be contrasted with Congress' approach to control over mining on federal lands, as to which Congress authorized comprehensive procedures and standards for assertion and protection of mineral claims. *See* 30 U.S.C. §§ 22 *et seq.* (1976). The United States Supreme Court has recently noted that "although mining law and water law developed together in the West prior to 1866, with respect to federal lands Congress chose to subject only mining to comprehensive federal regulation." *Andrus v. Charlestone Stone Products Co.,* 436 U.S. 604, 98 S.Ct. 2002, 56 L.Ed.2d 570 (1978).

**12.** The McCarran Amendment, 43 U.S.C. § 666 (1976), was enacted in 1952 as a rider to the Department of Justice Appropriations Act, §§ 208(a)–(c), 66 Stat. 560 (1952). The McCarran Amendment provides in pertinent part:

"§ 666 Suits for Adjudication of Water Rights
"(a) Joinder of United States as defendant: Costs

Consent is given to join the United States as a defendant in any suit (1) for the adjudication of rights to the use of water of a river system or other source, or (2) for the administration of such rights, where if appears that the United States is the owner of or is in the process of acquiring water rights by appropriation under State law, by purchase, by exchange, or otherwise, and the United States is a necessary party to such suit. The United States, when a party to any such suit, shall (1) be deemed to have waived any right to plead that the State laws are inapplicable or that the United States is not amenable thereto by reason of its sovereignty, and (2) shall be subject to the judgments, orders, and decrees of the court having jurisdiction, and may obtain review thereof, in the same manner and to the same extent as a private individual under the circumstances: *Provided,* that no judgment for costs shall be entered against the United States in any such suit."

know and evaluate the extent of his priorities to the use of water. To have these federal rights in a state of uncorrelated mystery is frustrating and completely contrary to orderly procedure—and this is equally true from the standpoint of the United States as well as Colorado and its citizenry."

169 Colo. at 579–80, 458 P.2d at 772. By enacting the McCarran Amendment, Congress waived the sovereign immunity of the United States to involuntary joinder as a party in state court general water rights adjudications. *See United States v. District Court for Eagle County, supra; United States v. District Court for Water Division No. 5,* 401 U.S. 527, 91 S.Ct. 1003, 28 L.Ed.2d 284 (1971).

The McCarran Amendment does not affect the federal government's substantive rights with respect to water on federal land. It has, however, often been relied upon as evidence of congressional recognition of the primacy of the western states' interests in regulating and administering water rights. *See, e.g., California v. United States, supra.* The Senate Report on the McCarran Amendment states:

> "In the arid Western States, for more than 80 years, the law has been that the water above and beneath the surface of the ground belongs to the public, and the right to the use thereof is to be acquired from the State in which it is found, which State is vested with the primary control thereof.... Since it is clear that the States have the control of water within their boundaries, it is essential that each and every owner along a given water course, including the United States, must be amenable to the law of the State, if there is to be a proper administration of the water law as it has developed over the years."

S.Rep. No. 755, 82d Cong., 1st Sess. 3, 6 (1951). Therefore, by enacting the McCarran Amendment, Congress recognized that the western states have a legitimate interest in and responsibility for the allocation of water resources within their borders, including the determination and adjudication of the water rights claimed by the United States. It is on the basis of this historical legal framework that the issues in the appeals now before us are to be determined.

## II.

## PROCEDURAL BACKGROUND

The enactment of the McCarran Amendment did not lead to an immediate wholesale adjudication of federal water rights, for the predicate to such proceedings was the commencement of a general adjudication to which the United States was joined as a necessary party. In November 1967, however, the Colorado River Water Conservation District (District) began a proceeding for a supplemental adjudication of water rights in former Water District 37 under the now superseded Colorado Water Adjudication Act of 1943, C.R.S.1963, 148–9–7. Pursuant to the McCarran Amendment, the District effected service of process on the United States.[13] The United States then commenced an original proceeding in this Court seeking a writ of prohibition to bar the Eagle County District Court from asserting jurisdiction over the water rights of the United States.

In *United States v. District Court for Eagle County,* 169 Colo. 555, 458 P.2d 760 (1969), this Court rejected the challenge of the United States to the jurisdiction of the district court as well as the federal government's assumption that it could not thereby obtain "an adequate judicial determination of its rights to the use of water and of the relative priorities of those rights to other water rights." 169 Colo. at 563, 458 P.2d 760. Writing for a unanimous court, Justice Groves concluded that it was the intent

13. Following service upon the United States in Water District 37, the United States was similarly served and joined in supplemental adjudications in former Water Districts 36, 51, and 52. The United States objected to adjudication of its rights in those proceedings on grounds identical to those presented in the Water District 37 proceedings. All parties accordingly stipulated that the ultimate decision in Water District 37 would also govern the other proceedings in Water Districts 36, 51, and 52.

of Congress to make possible the adjudication of the water rights of the United States in Colorado, that the adjudications at issue were within the scope of the proceedings authorized by the McCarran Amendment, and that the organization of Colorado water adjudications into districts of relatively limited geographic scope did not render the consent of the United States inapplicable. *Id.* Accordingly, since the district court was vested with plenary jurisdiction by Art. VI, Sec. 9(1) of the Colorado Constitution to entertain the claims of the United States,[14] this Court declined to restrain the district court from exercising jurisdiction over the United States.

The United States sought and secured certiorari review of the decisions in *Eagle County* and in the companion case of *United States v. District Court for Water Division No. 5* (S.Ct. No. 24821, unpublished

decision announced July 9, 1970), in which a writ of prohibition was denied in similar proceedings in Water Divisions 4, 5, and 6.[15] Both decisions were unanimously affirmed. *United States v. District Court for Eagle County,* 401 U.S. 520, 91 S.Ct. 998, 28 L.Ed.2d 278 (1971); *United States v. District Court for Water Division No. 5,* 401 U.S. 527, 91 S.Ct. 1003, 28 L.Ed.2d 284 (1971). In *Eagle County,* the United States Supreme Court found no obstacle to the adjudication of federal rights under Colorado law. Similarly, in *Water Division No. 5,* the Court again rejected the sovereign immunity claim advanced by the United States.[16]

Following the final adjudication of its sovereign immunity claims, the United States submitted claims for water rights in each of the proceedings in which it had been joined in the appropriate district or

**14.** Article VI, Section 9(1) of the Colorado Constitution provides:
"The district courts shall be trial courts of record with general jurisdiction, and shall have original jurisdiction in all civil, probate, and criminal cases, except as otherwise provided herein, and shall have such appellate jurisdiction as may be prescribed by law."

**15.** Water Districts 36, 37, 51, and 52 were judicial units created under the Colorado Water Adjudication Act of 1943, C.R.S.1963, 148–9–7 *et seq.* The Water Adjudication Act of 1943 was repealed and superseded by the Colorado Water Right Determination and Administration Act of 1969, sections 37–92–101 *et seq.,* C.R.S. 1973, which, *inter alia,* consolidated the former water districts, established seven new water divisions as the new judicial units, and created the current Colorado procedure under which this case thereafter proceeded. Subsequent to the adoption of the Water Right Determination and Administration Act, the United States was served and joined in Water Divisions 4, 5, and 6. The United States thereafter renewed its objections to the exercise of jurisdiction over it in Water Divisions 4, 5, and 6, moved unsuccessfully to quash service, and ultimately sought a writ of prohibition. *United States v. District Court for Water Division No. 5,* (S.Ct. No. 24821, unpublished decision, announced July 9, 1970).

**16.** In *United States v. District Court for Eagle County,* 169 Colo. 555, 458 P.2d 760 (1969), this Court expressly declined to decide whether the reserved rights claimed by the United States existed or, if they did, whether the United

States could secure adjudicated priorities therefor that antedate previously adjudicated priorities:
"We are not determining whether the United States has reserved water rights in connection with lands withdrawn subsequent to August 1, 1876, the date of Colorado's admission to the Union; nor, if so, whether these rights have priority over previously adjudicated rights. These questions properly should be decided after the United States presents its specific claims for adjudication and the issues of fact and law are clearly drawn."
*Id.* at 577, 458 P.2d at 770. Noting this Court's reservation of a decision on the reserved water rights issues, the United States Supreme Court observed:
"All such questions, including the volume and scope of particular reserved rights, are federal questions which, if preserved, can be reviewed here after final judgment by the Colorado court."
*United States v. District Court for Eagle County,* 401 U.S. 520, 526, 91 S.Ct. 998, 1003, 28 L.Ed.2d 278, 283 (1971). Similarly, in *United States v. District Court for Water Division No. 5,* 401 U.S. 527, 91 S.Ct. 1003, 28 L.Ed.2d 284 (1971), the Court reiterated that "if there is a collision between prior adjudicated rights and reserved rights of the United States, the federal question can be preserved in the State decision and brought here for review." 401 U.S. at 530, 91 S.Ct. at 1005. *See also* Elliot & Balcomb, *Deference to State Courts in Adjudication of Reserved Water Rights,* 53 Den.L.J. 643 (1976).

water courts.[17] In addition to thousands of claims for appropriative rights, the United States submitted claims for reserved water rights covering seven national forests (Arapaho, Grand Mesa, Gunnison, Manti-La Sal, Routt, Uncompahgre, and White River); three national monuments (Black Canyon of the Gunnison National Monument, Colorado National Monument, and Dinosaur National Monument); one national park (Rocky Mountain National Park); over 1,500 public waterholes and springs; two mineral hot springs; and the public domain administered by the Bureau of Land Management.[18] The federal claims were premised upon two legal theories: (1) the federal reserved rights doctrine in *Winters v. United States,* 207 U.S. 564, 28 S.Ct. 207, 52 L.Ed. 340 (1908), and its sequelae;[19] and (2) compliance with Colorado law based upon the appropriation and application to beneficial use for other enumerated water rights.[20] Notice was given to all water users of record in the affected river basins and, shortly thereafter, the claims were consolidated by this Court for disposition by the water court. *See* section 37–92–203(2), C.R.S.1973. A master-referee was then appointed by the water court pursuant to

C.R.C.P. 53 to receive evidence, adjudicate the federal claims, and submit a report and a proposed decree.

The claims of the United States were originally objected to by 169 parties represented by at least 70 different attorneys. In August 1972, two pretrial conferences were held before the master-referee, and nineteen separate hearings were thereafter conducted on the claims for reserved water rights over a period of approximately three years. The hearings resulted in over 10,000 pages of transcript. On August 6, 1976, the master-referee submitted a 1,084 page final report to the water court containing findings of facts, conclusions of law, and a proposed decree regarding the claims of the United States.

Objections and supporting briefs were thereafter filed with the water court by several parties, including the United States. Oral argument on all of the objections was held before the water court on May 23 and 24, 1977, and, on March 6, 1978, the water court entered its findings of fact, conclusions of law, and order with reference to the master-referee's report. The water court overruled most objections and sustained, with several significant exceptions

**17.** Claims based upon the Water Adjudication Act of 1943 were filed in the appropriate district courts as follows: Summit County (for former Water District No. 36), Grand County (for former Water District No. 51), and Eagle County (for former Water District Nos. 37 and 52). Claims filed under the Water Right Determination and Administration Act of 1969 were filed in the appropriate water courts for Water Divisions 4, 5, and 6. *See* sections 37–92–203(1)–(3), –204(1), –302, –304, C.R.S.1973.

**18.** The United States ultimately withdrew its claims for reserved water rights on the public domain administered by the Bureau of Land Management.

**19.** *United States v. New Mexico,* 438 U.S. 696, 98 S.Ct. 3012, 57 L.Ed.2d 1052 (1978); *Cappaert v. United States,* 426 U.S. 128, 96 S.Ct. 2062, 48 L.Ed.2d 523 (1976); *Colorado River Water Conservation District v. United States,* 424 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976); *United States v. District Court for Eagle County,* 401 U.S. 520, 91 S.Ct. 998, 28 L.Ed.2d 278 (1971); *United States v. District Court for Water Division No. 5,* 401 U.S. 527, 91 S.Ct. 1003, 28 L.Ed.2d 284 (1971); *Arizona v. California,* 373 U.S. 546, 83 S.Ct. 1468, 10

L.Ed.2d 542 (1963); *Federal Power Commission v. Oregon,* 349 U.S. 435, 75 S.Ct. 832, 99 L.Ed. 1215 (1955). *See also California v. United States,* 438 U.S. 645, 98 S.Ct. 2985, 57 L.Ed.2d 1018 (1978); *United States v. Rio Grande Dam & Irrigation Co.,* 174 U.S. 690, 19 S.Ct. 770, 43 L.Ed. 1136 (1899).

**20.** The United States has not advanced in Divisions 4, 5, and 6 any claims based upon the doctrine of federal non-reserved water rights which is the subject of three recent opinions by the solicitor of the Department of the Interior. *See Opinion—Federal Water Rights of the National Park Service, Fish and Wildlife, Bureau of Reclamation, and Bureau of Land Management* (Solicitor Krulitz), 86 Interior Dec. 553 (1979), *modified, Memorandum of the Solicitor of the Department of the Interior* Solicitor Martz, 88 Interior Dec. 253 (1981)), *repudiated by, Non-Reserved Water Rights—United States Compliance with State Law* (Solicitor Coldiron), 88 Interior Dec. 1055 (1981). *See generally* Little, *Administration of Federal Non-Indian Water Rights,* 27 Rocky Mtn.Min.L.Inst. 1709 (1982).

noted in part III of this opinion, the prior rulings of the master-referee. Numerous parties, including the United States, subsequently filed motions to amend the decree or, in the alternative, for a new trial. The motions were denied in most part by the water court on October 2, 1978, and it entered an interlocutory decree on the same date. The water court adopted the master-referee's proposed decree with modifications reflecting the court's rulings on the prior objections. After supplemental findings and conclusions and conforming changes were made in the decree on January 24, 1979, the water court entered an order pursuant to C.R.C.P. 54(b) allowing an immediate appeal to go forward on all claims determined. The United States and Denver thereafter appealed.

### III.

### DISPOSITION IN THE WATER COURT

Both the master-referee and the water court upheld the application of the reserved rights doctrine in Colorado and rejected arguments made by various water users, most notably Denver, that no such rights exist.[21] The water court rejected arguments to the effect that the federal government had ceded to Colorado all title and exclusive authority over waters located on the public lands and federal reservations and, therefore, subsequently lacked the power to reserve water.[22]

The water court's key rulings were that: (1) the United States had the power, both before and after Colorado's admission to statehood in 1876, to reserve water to itself by withdrawal and reservation of certain lands from the public domain; (2) only appurtenant waters unappropriated at the time of the reservation could be affected by

the withdrawal or reservation; (3) the necessary intent to reserve water may be implied from the purpose(s) of the reservation; (4) the quantity of water reserved is that minimal amount necessary to fulfill the purpose(s) for which the reservation was originally created; (5) reserved waters may be used only to fulfill the actual primary reservation purpose(s); (6) a priority date as of the date of the reservation attaches to reserved rights; (7) reserved water rights are subordinate in priority to all appropriations initiated prior to the date of the reservation, whether or not adjudicated by Colorado law; (8) reserved water rights are merely the right to use water and do not represent federal title to or ownership of water; (9) reserved rights constitute a unique exception to Colorado's otherwise absolute ownership of water in natural streams within its boundaries; (10) reserved rights are appurtenant to the lands with which they are reserved; and (11) reserved rights are available to the United States only in its proprietary capacity and not in its sovereign capacity and, therefore, may not be used by federal concessionaires, permittees, and lessees.

More specifically, the water court concluded as follows:

#### A. *Purposes of Reservations*

The water court found as a matter of fact and law the intent necessary to reserve water with respect to each of the major reservations at issue. The water court, however, rejected the federal government's contentions as to the purposes of the reservations in many instances and, accordingly, decreed water rights more limited in quantity and more restricted in permissible use than the United States had originally sought. In particular, the water court held

---

21. The water court rejected, *inter alia,* arguments based upon the Desert Land Act of 1877, 43 U.S.C. § 321 (1976); the Act of July 9, 1870, 43 U.S.C. § 661 (1976); the equal footing doctrine; Article XVI, Section 5 of the Colorado Constitution; the Statehood Enabling Act of Colorado, Vol. 1A at 43, C.R.S.1973; and *Stockman v. Leddy,* 55 Colo. 24, 129 P. 220 (1912).

22. The water court thus rejected the fundamental premise of the decision by the District Court in and for Water Division No. 1 in *City and County of Denver v. United States,* Colo., 656 P.2d 36, S.Ct. No. 79SA344, which denied the existence of federal reserved water rights in Colorado. We have held the appeals in that case in abeyance pending the decision herein. (Minute Order of June 19, 1980.)

that: (1) no water had been reserved for maintaining minimum instream flows in national forests; (2) no water had been reserved for instream flows for recreational boating purposes at Dinosaur National Monument; (3) reserved rights for public waterholes and springs reserved under 43 U.S.C. §§ 141 and 300 (1976) were limited to the amount needed for human and animal drinking water; and (4) reserved rights for two mineral hot springs did not include water necessary for geothermal power production purposes.

## B. *Priority Dates*

The water court accepted the federal government's contention that reserved rights take a priority equivalent to the date of the reservation. It held, however, that such rights are nevertheless subordinate in priority to appropriations initiated prior to the date of the reservation whether or not they had been adjudicated under Colorado law on that date or thereafter.

## C. *Quantification of Decreed Rights*

The water court held that the federal government was required by state law, by the McCarran Amendment, 43 U.S.C. § 666 (1976), and by its own consent to quantify its reserved rights. It awarded absolute decrees establishing water rights for all existing diversions and off-stream uses in national parks, national forests, and national monuments for which reserved water was sought in an amount serving existing uses. In addition, the water court entered conditional decrees apportioning certain amounts of additional reserved water for future diversions and impoundments in the national forests and monuments and in Rocky Mountain National Park. *See* section 37–92–305, C.R.S.1973.

The water court also awarded conditional decrees for an unquantified amount of water for existing and future diversions and impoundments from all reserved public waterholes, springs, and mineral hot springs; it allowed the federal government four years from the date of the decree to quantify its claims and to submit them for judicial approval. However, the water court held that the reservations of public waterholes and springs pursuant to 43 U.S.C. §§ 141 and 300 (1976) reached only water sources which were not tributary to any running stream.

Conditional decrees were also awarded for minimum stream flows and lake levels in national parks and monuments, but the water court rejected all claims for such rights in national forests. It allowed five years for quantification of minimum stream flow claims for the purposes it recognized in Rocky Mountain National Park and in the national monuments generally, and allowed six months for quantification of instream right claims for fish habitats in Dinosaur National Monument. The water court rejected, in their entirety, the United States' claims for instream flows for recreational boating in Dinosaur National Monument.

All of the conditional water rights were subjected to the requirement that the United States report quadrennially regarding its progress in reducing the reserved waters to actual beneficial use. However, the United States was allowed five years to make its report as to minimum stream flows, so as coincide with the scheduled quantification of its claims. With respect to each of the reservations for which water rights were decreed, the water court held that the original claims and the forthcoming quantifications would fix the maximum extent of federal reserved water rights for all time. Future claims for additional amounts were to be cognizable only under Colorado's prior appropriation doctrine. The water court declined to rule upon several reserved rights claims for public waterholes which had been inadvertently omitted from the federal government's formal water applications.

## D. *Defeasibility of National Forest Reserved Rights*

The water court subjected all reserved rights decreed for national forest lands, whether conditional or absolute, to appropriation by other water users. It interpreted 16 U.S.C. § 481 (1976), a provision of the Organic Act for the national forest system, as establishing that the availability of water supplies for private domestic, mining,

milling, and agricultural use was the over-riding purpose of all national forests. The water court also interpreted section 481 to make the water rights of the United States in the national forests defeasible upon private appropriation for one of the statutory purposes, irrespective of whether the appropriation was initiated prior to or subsequent to the date of the reservation.

### E. *Administration of Water Rights*

Relying on the McCarran Amendment, Colorado law, and the consent of the government, the water court held that the absolute decrees awarded to the United States were to be administered by the State Water Engineer. In addition, all changes in federal water use were held to be subject to Colorado change-in-use procedures. *See* section 37–92–302, C.R.S.1973. The water court also held that change-in-use proceedings were a necessary prerequisite to any application of reserved waters to land reserved at a different time from that portion with which the particular waters were reserved. The court decreed that no change-in-use decree was to be entered authorizing the use of reserved waters for a use outside a primary reservation purpose. Similarly, the water court prohibited any use of reserved water on lands outside a federal reservation.

### F. *Estoppel Claims*

The water court held that the United States could be estopped from asserting reserved water rights irrespective of whether it acted in a governmental or proprietary capacity. To estop the federal government, the court required a moving party to show justifiable detrimental reliance upon an affirmative and material misrepresentation of fact by the government as to the existence of federal reserved water rights. The water court ultimately upheld the estoppel claims made by three parties, although it rejected sweeping claims of estoppel by numerous parties as legally or factually unsound. It estopped the United States from asserting reserved rights conflicting with the appropriative rights of the Southeastern Colorado Water Conservancy District and the Twin Lakes Reservoir and Canal

Co. in the federal Fryingpan-Arkansas water reclamation project. The water court interpreted the project's operating plan as federal recognition of the Southeastern Colorado Water Conservancy District's water rights priorities, but rejected a claim that the operating plan constituted a quitclaim of all federal water rights not expressly reserved therein. The court also determined that the federal grants of rights-of-way and contractual water exchanges with Twin Lakes Reservoir and Canal Co. contemplated by the Fryingpan-Arkansas operating plan estopped the United States from asserting reserved rights to the detriment of Twin Lakes.

In addition, the water court concluded that the United States was estopped to assert reserved water rights in any manner which would interfere with Denver's water rights recognized by the Blue River Decree. The Blue River Decree is a consent decree formulated in 1955 as a result of prior litigation between Denver and the United States in *United States v. Northern Colorado Water Conservancy District,* No. 2782 (D.Colo.1955). The United States has taken no appeals from any of the estoppel provisions in the water court's decree.

### G. *Claims for Appropriative Rights*

The basic factual determinations on appropriative rights claims were made by the standing water referees in Water Division Nos. 4, 5, and 6 and were generally undisputed. The United States was granted all of the appropriative rights it asserted with the exception of a few claims which, apparently, were omitted from its formal water rights applications and statements of claim, and which the water court accordingly declined to consider.

Two legal issues respecting the government's appropriative rights, however, were preserved for the master-referee's consideration. The master-referee ruled that the United States' claim for appropriative rights for instream use of water for fire protection, wildlife and livestock watering, and recreation was valid and entitled to recognition notwithstanding the absence of a permanent man-made diversion structure.

Moreover, notwithstanding the contrary provisions of the Water Right Determination and Administration Act, sections 37–92–301 *et seq.,* C.R.S.1973, the master-referee ruled that the United States was entitled to antedation of its appropriative rights so as to ·allow a "true priority" based upon the date of actual appropriation. Since the federal government had formerly been immune from suit to determine its water rights, the master referee noted that its absence from all previous adjudications was privileged and, accordingly, that it could neither be bound nor prejudiced by the priorities determined therein.

No objections were made to these rulings, except for an unsuccessful objection by the federal government to the master-referee's refusal to consider the few appropriative claims which had been inadvertently omitted from the water rights applications and statements of claims.

### H. *Filing Fees*

In these consolidated proceedings, the United States paid $3,728 in filing fees pursuant to the Colorado Water Right Determination and Administration Act, *supra,* and the predecessor Colorado Water Adjudication Act of 1943, C.R.S.1963, 148–9–7 *et seq.* Payments were made under protest on the theory that the United States had not consented to liability for such fees.[23] The water court held, however, that the United States, by consenting to suit through the McCarran Amendment, became subject like other parties to the obligation to pay routine filing fees. The water court also held that the statutory exemption from filing fees available to the State of Colorado and its subdivisions and instrumentalities, but not to the United States, did not discriminate impermissibly against the federal government. *See* section 37–92–302(1)(d), C.R.S.1973.

For the reasons expressed herein, we affirm in part and reverse in part and remand this case to the water court with directions to modify its decree in accordance with the views stated in this opinion.

### IV.

### JUDICIAL RECOGNITION OF FEDERAL RESERVED WATER RIGHTS

Of all the parties before us in these appeals, only Denver takes issue with the fundamental proposition that the United States has reserved water rights in Colorado. Specifically, Denver argues that: (1) the United States never succeeded to any interest in the waters of the Colorado Territory and, accordingly, could not reserve any such waters from appropriation; (2) on the basis of the Desert Land Act of 1877, 43 U.S.C. § 321 (1976), the Act of July 9, 1870, 43 U.S.C. § 661 (1976), and the Act of July 26, 1866, 43 U.S.C. § 661 (1976), the United States abandoned any interest in the waters on the public domain in Colorado and, therefore, could not subsequently reserve any waters to itself; (3) under the equal footing doctrine enunciated in *Pollard's Lessee v. Hagan,* 44 U.S. (3 How.) 212, 11 L.Ed. 565 (1845), and in *Shively v. Bowlby,* 152 U.S. 1, 14 S.Ct. 548, 38 L.Ed. 331 (1894), the admission of Colorado into the United States divested the federal sovereign of any interest in water within Colorado;[24] (4) the United States acquiesced in Colorado's claim, embodied in Article XVI, section 5 of the Colorado Constitution, that the ownership of the waters in this State was vested in the public and, accordingly, forfeited all federal interest in Colorado's waters; (5) the McCarran Amendment bars the United States from acquiring any water rights except pursuant to state substantive water law; and (6) the water court lacked authority under Colorado law to recognize federal reserved water rights or to specify their incidents. In addition, Denver characteriz-

---

**23.** This claim by the United States rested predominantly on the last phrase of the McCarran Amendment, 43 U.S.C. § 666(a) (1976), which states: "*Provided:* That no judgment for costs shall be entered against the United States in any such suit."

**24.** The federal acts admitting the western states into the Union guaranteed each state "equal footing" with the original states. *See Pollard's Lessee v. Hagan,* 44 U.S. (3 How.) 212, 11 L.Ed. 565 (1845).

es United States Supreme Court decisions contrary to its position as mere *dicta* or otherwise inapposite, and alleges that they should be disregarded by this Court. Each of Denver's contentions was rejected in the opinion of the master-referee and, subsequently, in the decision of the water court.

On appeal, Denver again seeks a repudiation of the very existence of reserved water rights and an affirmation of an unfettered power in the State of Colorado to determine all federal claims to the use of water in this State by Colorado law. The proposition advanced by Denver was for many years an article of faith throughout the West and was adopted by this Court in *Stockman v. Leddy,* 55 Colo. 24, 129 P. 220 (1912):

> "This constitution of ours was ratified and adopted by the legal voters of the state in accordance with the conditions prescribed by the enabling act of Congress, and the president of the United States in his proclamation admitting Colorado into the Union found the fact to be that the fundamental conditions imposed by congress on the State of Colorado to entitle it to such admission had been complied with. Congress, in passing the enabling act, and the President, in issuing his proclamation, were aware of the existing physical conditions and of the topography and geography of the state. The federal government, by its lawmaking and executive bodies, knew that the natural streams of this state are, in fact, nonnavigable within its territorial limits, and practically all of them have their sources within its own boundaries, and that no stream of any importance whose source is without those boundaries, flows into or through this state. The entire volume of these streams is therefore made up of rains and snows that fall

upon the surface of lands included within the exterior lines of this state and of springs which issue from the earth within the same area. Such being the peculiar conditions, the state was justified in asserting its ownership of all the natural streams within its boundaries. When Colorado was admitted into the Union with such a constitution, the federal government, through its lawmaking and executive departments, thereby recognized and confirmed such right of ownership as belonging to the state in its sovereign capacity. We therefore find it to be not only that our state constitution and pertinent statutes, but the decisions of the courts and duly announced public policy, all are in accord on the proposition to which the federal government has, as we have just shown, given its consent that the waters of the natural streams of this state belong to the people, to the state, in its sovereign capacity, and that its right to their distribution and control within its borders is free from any interference by any other sovereignty."

*Id.* at 28–29, 129 P. at 222. *See also* Bannister, *The Question of Federal Disposition of State Waters in Priority States,* 28 Harv.L. Rev. 270 (1915).

Under the Supremacy Clause of the United States Constitution, however, it is our duty to adhere to the principles of federal law that have been enunciated by the United States Supreme Court.[25] We therefore reject Denver's argument that the United States ceded to Colorado absolute power to create or establish water rights in this state, and take cognizance of the holdings of the United States Supreme Court that articulate the basic principles of the reserved water rights doctrine. *See, e.g., United States v. New Mexico,* 438 U.S. 696,

---

**25.** The Supremacy Clause states that the law of the United States is "the supreme Law of the Land" and that "the judges in every State shall be bound thereby, anything in the Constitution or Laws of any State to the contrary notwithstanding." *U.S. Const.* art. VI, cl. 2. It is ultimately the province of the United States Supreme Court to set forth the law on matters involving questions of federal law, *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 2 L.Ed.2d 60

(1803), and the questions presented in these appeals are questions of federal law. *United States v. District Court for Eagle County,* 401 U.S. 520, 91 S.Ct. 998, 28 L.Ed.2d 278 (1971). Therefore, Denver's suggestions that we are not bound to abide by the relevant decisions of the United States Supreme Court because, in Denver's view, they are "heresy" is without any constitutional foundation.

98 S.Ct. 3012, 57 L.Ed.2d 1052 (1978); *California v. United States,* 438 U.S. 645, 98 S.Ct. 2985, 57 L.Ed.2d 1018 (1978); *Cappaert v. United States,* 426 U.S. 128, 96 S.Ct. 2062, 48 L.Ed.2d 523 (1976). To the extent that *Stockman v. Leddy, supra,* conflicts with our disposition, we overrule it and affirm the decision of the water court on this issue.[26]

The doctrine of federal reserved water rights is judicially created. The power of the United States to legislate a federal system for the use and disposition of unappropriated non-navigable waters on federal lands generally, and on reserved lands specifically, is derived from the Property Clause of the United States Constitution.[27] *U.S. Const.,* Art. IV, Sec. 3. Based upon a recognition of Congress' underlying power, the United States Supreme Court has constructed a body of law, derived by judicial implication from congressional actions, holding that:

> "Congress, in giving the President the power to reserve portions of the federal domain for specific federal purposes, *impliedly* authorized him to reserve 'appurtenant water then unappropriated *to the extent needed to accomplish the purposes of the reservation.*'"

*United States v. New Mexico,* 438 U.S. at 699–700, 98 S.Ct. at 3013–3014, *quoting Cappaert v. United States,* 426 U.S. at 138, 96 S.Ct. at 2069 (emphasis in original). The existence of the reserved rights doctrine is now well recognized, and the United States Supreme Court has confirmed its existence as a matter of federal law in several cases throughout the past one hundred years.[28] *See, e.g., United States v. New Mexico, supra; Cappaert v. United States, supra;*

*Arizona v. California,* 373 U.S. 546, 83 S.Ct. 1468, 10 L.Ed.2d 542 (1963); *Federal Power Commission v. Oregon,* 349 U.S. 435, 75 S.Ct. 832, 99 L.Ed. 1215 (1955); *Winters v. United States,* 207 U.S. 564, 28 S.Ct. 207, 52 L.Ed. 340 (1908); *United States v. Rio Grande Dam & Irrigation Co.,* 174 U.S. 690, 19 S.Ct. 770, 43 L.Ed. 1136 (1899).

The scope of the reserved rights doctrine has, however, been defined only recently. In *Cappaert v. United States, supra,* the United States Supreme Court set forth a concise statement of the doctrine upon which the federal reserved water rights claims rest:

> "This Court has long held that when the Federal Government withdraws its land from the public domain and reserves it for a federal purpose, the Government, by implication, reserves appurtenant water then unappropriated to the extent needed to accomplish the purpose of the reservation. In so doing the United States acquires a reserved right in unappropriated water which vests on the date of the reservation and is superior to the rights of future appropriators. Reservation of water rights is empowered by the Commerce Clause, Art. I, § 8, which permits federal regulation of navigable streams, and the Property Clause, Art. IV., § 3, which permits federal regulation of federal lands. The doctrine applies to Indian reservations and other federal enclaves, encompassing water rights in navigable and nonnavigable streams."

426 U.S. at 138, 96 S.Ct. at 2069 (citations omitted). In *Cappaert,* the Supreme Court unanimously held that the reservation of the Devil's Hole National Monument under the American Antiquities Preservation Act

---

**26.** Since we believe that the decisions of the United States Supreme Court leave no room for doubt as to the correctness and necessity of a decision that federal reserved water rights do indeed exist, we do not specifically address in this opinion the individual arguments raised by Denver in urging a contrary result.

**27.** *See supra* note 6. In *Cappaert v. United States,* 426 U.S. 128, 96 S.Ct. 2062, 48 L.Ed.2d 523 (1976), the United States Supreme Court also identified the Commerce Clause, *U.S. Const.,* art. I, sec. 8, as a source of constitution-

al power to effect federal reservations of water. The United States has not predicated any of its claims in this case on the Commerce Clause, and we accordingly need not address the effect, if any, such an assertion would have on the disposition of these appeals.

**28.** For a discussion of the origins and development of the reserved rights doctrine, *see* Waring & Samelson, *Non-Indian Federal Reserved Water Rights,* 58 Den.L.J. 783 (1982).

of June 8, 1906, 34 Stat. 225, 16 U.S.C. § 431 (1976), also reserved sufficient unappropriated water to sustain the scientific value of the reservation. The reservation required that the water level in Devil's Hole be maintained at the minimal level necessary to allow survival of the Devil's Hole pupfish, a unique species that had been endangered by a drop in the water level. The water level in the pool had declined due to pumping of groundwater by a nearby irrigator.[29]

The Court noted that in determining whether there is a federally reserved water right implicit in the federal reservation, the crucial issue is whether the government intended to reserve unappropriated water. 426 U.S. at 139–40, 96 S.Ct. at 2069–70. Intent is inferred if "previously unappropriated waters are necessary to accomplish the purposes for which the reservation was created." *Id.* The amount of water reserved, however, was "only that amount of water necessary to fulfill the purpose of the reservation, no more." *Id.* at 141, 96 S.Ct. at 2070 (citations omitted). The Court found that the reservation of Devil's Hole included an explicit reservation of some of the unappropriated water since a pool of water is meaningful only if the water remains. *Id.* at 139–40, 96 S.Ct. at 2069–70. From this intention, the Court found a corresponding intention to reserve to the United States water to sustain the Devil's Hole pupfish. Because the Cappaerts' water rights were junior to the 1952 rights of the United States based upon the date of the presidential proclamation creating the national monument, the federal government was entitled to the amount of water necessary to maintain the water level in Devil's Hole. The Court expressly approved the action of the lower court in tailoring its decree to satisfy the "minimal need"[30] of

the government. *Id.* at 141, 96 S.Ct. at 2070. Thus, the existence of a federal reservation does not in and of itself denote a reservation of water. Rather, there must be a determination of the precise federal purpose to be served, a determination that the purpose would be frustrated without water, and a determination of the minimum quantity of water required to fulfill the purpose.

In *United States v. New Mexico, supra,* the Supreme Court upheld, for the first time, a denial of reserved water rights to the federal government. In *New Mexico,* the United States Forest Service asserted reserved rights to waters within the Gila National Forest, including minimum instream flows, "for the requirements and purposes of the forests" as of the date that various tracts of public lands were withdrawn from the public domain for inclusion in the national forest. *Id.* The Forest Service's claims to reserved rights for, *inter alia,* maintenance of instream flows, recreation, and stock watering were initially granted by the special master appointed to consider the claims. They were ultimately denied by the New Mexico Supreme Court on appeal on the basis that such uses were not among the purposes included in the Organic Administration Act of 1897 (Organic Act of 1897), pursuant to which the Gila National Forest was created. *See* Act of June 4, 1897, ch. 2, § 1, 30 Stat. 34, 36 (now codified in 16 U.S.C. § 473 (1976)). The New Mexico Supreme Court drew a distinction between the primary purposes for which a federal reservation is created and the secondary uses of federal lands that may be permitted or authorized by statute or administrative practice, and concluded that only the former provides a basis for reserved rights. *Mimbres Valley Irrigation*

---

**29.** The case arose in an action by the United States to enjoin pumping of the wells by the owners and irrigators of a ranch near the Devil's Hole National Monument. The pumping had been authorized by a state permit after the date of reservation of the Monument. *See* 426 U.S. at 134–35, 96 S.Ct. at 2067–68. The Court sustained an injunction against the irrigators which limited pumping to avoid lowering the

water level in Devil's Hole beneath a ledge essential for the propagation of the desert pupfish. Excess water was left available to appropriators under state law.

**30.** "Minimal need" means that amount of water which is adequate to meet the needs and purposes of the reservation. 426 U.S. at 141, 96 S.Ct. at 2070.

*Co. v. Salopek,* 90 N.M. 410, 564 P.2d 615 (1977). The New Mexico Supreme Court also declared that the primary purposes of national forest reservations were limited to the preservation of timber and securing water flows for public and private uses. *Id.*

The United States Supreme Court agreed with both the result and analysis of the New Mexico Supreme Court. The majority noted that the application of the reserved water rights doctrine requires a careful examination of "both the asserted water right and the specific purposes for which the land was reserved" and must rest upon a conclusion that "without the water the purposes of the reservation would be entirely defeated." *United States v. New Mexico,* 438 U.S. at 700, 98 S.Ct. at 3014 (footnote omitted). Such an examination and tailoring of the reserved right is necessary "because the reservation is implied, rather than explicit, and because of congressional intent in the field of federal-state jurisdiction with respect to allocation of water." *Id.* at 701–02, 98 S.Ct. at 3015. The Court recognized that "whatever powers the States acquired over their waters as a result of congressional Acts and admission into the Union, however, Congress did not intend thereby to relinquish its authority to reserve unappropriated water in the future for use on appurtenant lands withdrawn from the public domain for specific federal purposes." *Id.* at 698, 98 S.Ct. at 3013.

The Supreme Court accepted the distinction of primary purposes and secondary uses drawn by the New Mexico Supreme Court:

"Where water is necessary to fulfill the very purposes for which a federal reservation was created, it is reasonable to conclude, even in the face of Congress' express deference to state water law in other areas, that the United States intended to reserve the necessary water. Where water is only valuable for a secondary use of the reservation, however, there arises the contrary inference that Congress intended, consistent with its other views, that the United States would acquire water in the same manner as any other public or private appropriator."

*Id.* at 702, 98 S.Ct. at 3015. Based upon the legislative history of the Organic Act of 1897, the Court concluded that Congress' intent in authorizing the reservation of Gila National Forest was "that water would be reserved only where necessary to preserve the timber or to secure favorable water flows for private and public uses under state law."[31] *Id.* at 718, 98 S.Ct. at 3023. The Court found recreation, wildlife, and stockwatering to be secondary uses rather than primary purposes of the reservation, and accordingly upheld the state court's denial of reserved rights for such uses.[32]

---

**31.** The opinion of the Court also concluded that the Multiple-Use Sustained-Yield Act of 1960, 16 U.S.C. §§ 528–531 (1976) (MUSYA), which provides that national forests "shall be administered for outdoor recreation, range, timber, watershed, and wildlife and fish purposes," does not provide any basis for assertion of reserved rights in forests existing as of the effective date of MUSYA "for the *secondary* purposes there established." 438 U.S. at 715, 98 S.Ct. at 3021 (emphasis in original). The Court, however, "intimate[d] no view as to whether Congress [in MUSYA] authorized the subsequent reservation of national forests out of public lands to which a broader doctrine of reserved water rights might apply." *Id.* at 715 n. 22, 98 S.Ct. at 3021 n. 22. As Justice Powell pointed out in his partial dissent from the Court's majority opinion, the Court's statements on the effect of MUSYA "appear to be *dicta,*" *id.* at 719 n. 1, 98 S.Ct. at 3023 n. 1, because the United States did not argue that MUSYA reserved additional water for use on

national forests, but only that the Act confirmed Congress' intent in the Organic Act to establish multiple purposes that include fish, wildlife, and recreation. *See id.* at 718 n. 1, 98 S.Ct. at 3023 n. 1. *See also infra,* Part V, subsection A, 3.

**32.** *United States v. New Mexico* was a 5–4 decision with Justices Brennan, White, and Marshall joining in a dissent written by Justice Powell. The dissenters did not take issue with the conclusion of the majority opinion written by Justice Rehnquist, that Congress had generally deferred to state water law and therefore "that the implied-reservation doctrine should be applied with sensitivity to its impact upon those who have obtained water rights under state law and to Congress' general policy of deference to state law," and concurred in the majority's conclusion that the Organic Act could not be read "as evidencing an intent to reserve water for recreational or stockwatering

We believe that in these appeals, as in *Cappaert* and *New Mexico,* our real task lies not so much in an examination of federal power to reserve waters, but rather with the necessity to state the limits and contours of the exercise of such federal power. To that end, we approve the procedure utilized by the water court in determining the federal government's entitlements under the reserved water rights doctrine. For each federal claim of a reserved water right, the trier of fact must examine the documents reserving the land from the public domain and the underlying legislation authorizing the reservation; determine the precise federal purposes to be served by such legislation; determine whether water is essential for the primary purposes of the reservation; and finally determine the precise quantity of water—the minimal need as set forth in *Cappaert* and *New Mexico* —required for such purposes. However, absent an enunciation of a rule of federal law by the United States Supreme Court, absent congressional action, and absent impingement on vital federal interests, we hold that Colorado law governing the determination of water rights is properly applied as the rule of decision by which we determine the contours of the reserved rights asserted by the United States. Our conclusion serves the general congressional policy of deference to state water law, mitigates the disruptive effect which reserved water rights have on other water rights, and aids in the integration of federal rights into the network of "highly interdependent" relative priorities to the use of water on common stream systems. *Colorado River Water Conservation District v. United States,* 424 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976).

After *Cappaert* and *New Mexico,* it is clear that the implied reservation doctrine applies to all federal enclaves and that the federal government may acquire rights to unappropriated water on federal lands when the land has been reserved pursuant to congressional authorization for a specific federal purpose that requires the use of water. Denver's arguments to the contrary must therefore be rejected. Accordingly, we conclude that the United States possesses reserved rights for its federal reservations in Colorado in waters unappropriated upon the date of reservation of the federal lands from the public domain, and in the amount necessary to achieve the primary purposes of the reservations.

V.

## EXTENT OF FEDERAL RESERVED WATER RIGHTS DOCTRINE

The extent of federal reserved water rights is controlled by the intent of Congress and the purposes for which the lands are reserved. The water claims in these appeals represent a broad cross-section of Congress' many goals and purposes in reserving public lands. Each congressional or executive pronouncement reserving federal lands presents us with a different analysis of the extent to which water rights are reserved.

The federal reservations in these appeals deal with five categories of public lands: (1) national forests, (2) national monuments, (3) national parks, (4) public springs and waterholes, and (5) mineral hot springs. In addition to its disposition of these issues, the water court's ruling addressed the manner in which reserved water rights are to be implemented and administered. For the reasons set forth below, we affirm in part and reverse in part the water court's determinations of the extent of federal reserved water rights. We also remand the case to the water court for modifications of its decree and supplemental proceedings in accordance with this opinion.[33]

purposes." 438 U.S. at 718, 98 S.Ct. at 3023. The dissenters disagreed, however, with the majority's narrow reading of the legislative history of the Organic Act to exclude preservation of wildlife as a primary purpose of the reserva-

tion of national forests. *Id.* at 719, 98 S.Ct. at 3023.

**33.** Certain aspects of the water court's disposition were not challenged by the United States on appeal. Major points of consensus include:

## A. National Forests

### 1. Applicability of 16 U.S.C. § 481

 The federal government claims that the water court improperly subordinated federal reserved water rights to appropriations made pursuant to Colorado law. The water court awarded reserved rights for the national forests subject to the condition that the rights "shall be and are subject to water appropriations under Colorado law for domestic, mining, milling, and irrigation beneficial uses, as provided by the Organic Act of 1897, codified in pertinent part at 16 U.S.C. § 481." Additionally, whether the priority date was before or after the federal reservation was held to be immaterial. The United States argues that federal reserved waters are not subject to private appropriations. We agree.

Section 481 of the Organic Act of 1897, 16 U.S.C. §§ 475 et seq. (1976) provides:

> "All waters within the boundaries of national forests may be used for domestic, mining, milling, or irrigation purposes, under the laws of the State wherein such national forests are situated, or under the laws of the United States and the rules and regulations established thereunder."

The water court concluded that the statute authorizes appropriation of federal reserved water. We believe that interpretation of section 481 misconstrues the Organic Act of 1897 and the case law which has interpreted federal reserved water rights.

In *Cappaert v. United States,* 426 U.S. 128, 96 S.Ct. 2062, 48 L.Ed.2d 523 (1976), the United States Supreme Court held that the federal government's reserved water rights had a priority date which vests at the date of reservation and are superior to the rights of future appropriators. 426 U.S. at 138, 96 S.Ct. at 2069. Accordingly, any appropriative rights established after the reservation date of a national forest are subordinate to the reserved right. Only water in excess of the minimal amount needed to fulfill the purposes of the national forests is available to subsequent appropriators. *See also Winters v. United States,* 207 U.S. 564, 28 S.Ct. 207, 52 L.Ed. 340 (1908) (reserved water exempt from appropriation under state law).

In *United States v. New Mexico,* 438 U.S. 696, 98 S.Ct. 3012, 57 L.Ed.2d 1052 (1978), the Supreme Court found that the Organic Act of 1897 reserved water for the purposes of conserving water flows and maintaining a continuous timber supply (confirming the findings of the New Mexico Supreme Court in *Mimbres Valley Irrigation Co. v. Salopek,* 90 N.M. 410, 564 P.2d 615 (1977)). Section 481 of the Organic Act of 1897 would frustrate the purposes of the national forests if it were read to allow private appropriation of reserved water essential to accomplish those purposes.[34] We do not believe Con-

---

1. The United States agrees that it is bound to quantify the water rights asserted in this opinion.
2. The United States agrees that its water rights are subject to administration by the State Engineer. Sections 37–92–101 et seq., C.R.S.1973; *see infra* Part F, subsection 6.
3. The United States agrees to comply with state law procedures governing change of use and change of diversion. *See infra* Part F, subsection 5.
4. The United States agrees to advise the State Engineer quadrennially of progress it has taken to apply to beneficial use waters covered by conditional decrees. *See infra* Part F, subsection 2.
5. The United States agrees to pay filing fees required by Colorado law.
6. The United States agrees that its water rights may not be asserted in derogation of the rights decreed to Denver under the 1955 Blue River Decree.

7. The United States agrees that its water rights may not be asserted in derogation of the rights of the Southeastern Colorado Water Conservancy District and of the Twin Lakes Reservoir and Canal Co. that were recognized by Congress in approving the Fryingpan-Arkansas reclamation project.

**34.** The Organic Administration Act of 1897, 16 U.S.C. §§ 475 et seq. (1976), was a response to overzealous reservation of national forest preserves by Presidents Harrison and Cleveland between 1891 and 1897. *See* Steen, *The United States Forest Service, A History* 22–24 (1976). Congress intended to allow substantial use of the national forest resources. It provided for private use under section 481 (appropriation of excess forest water) and section 475 (limitation on national forest purposes). Section 475 provides:

> "All public lands designated and reserved prior to June 4, 1897, by the President of the

gress granted private appropriators the ability to take water necessary to fulfill the purposes of the national forests. The water court's order would give private appropriators the power to divert national forest water even if it meant that the timber supply would diminish or that water flows would be disrupted. Section 481 is more sensibly read to express Congress' concern that national forest reservations should not preclude future private appropriations. The section confirms the coexistence of federal water rights and private appropriation under state law. Congress was well aware of the role water plays in the economic development of the West when it enacted the Organic Act of 1897. It sought to strike a balance between federal stewardship and state economic development. Thus, any water in excess of that needed to fulfill the purposes of the national forests was made available by Congress to subsequent private appropriators. 438 U.S. at 712–13, 98 S.Ct. at 3020.

We reverse the water court's decree insofar as it subordinates national forest reserved rights to subsequent appropriations. Federal reserved water rights have a vested priority dating from the initial reservation. The reserved rights decreed by the water court to the federal government are necessary to fulfill the purposes of watershed and timber protection. They do not conflict with the limitations of section 481, which guarantees that excess waters remain available to private appropriators. The federal purposes, however, cannot be subverted by state and private water diversions which jeopardize the existence of the national for-

ests. The water court's decree shall therefore be modified so that the federal government is granted sufficient water to fulfill the purposes for which the national forests were established. All excess water is available to other appropriators under the dictates of section 481.

### 2. Instream Flows in National Forests

■ The federal government claims that it has a reserved water right for instream water flows necessary to fulfill national forest purposes. The water court found: (1) that the United States has no instream flow rights for recreational, scenic, and wildlife protection purposes; and (2) that since the United States did not claim any instream flow rights for the Organic Act of 1897 purposes of watershed and timber protection, the court could not award such water rights. We agree with the water court's determinations.

The United States Supreme Court expressly found in *United States v. New Mexico, supra,* that the Organic Act of 1897 does not provide for instream flows for recreational, wildlife, and scenic purposes. *Id.* at 705, 98 S.Ct. at 3016. The water court decision is in accordance with that interpretation of federal law. The United States has also failed to demonstrate that the instream flow right it claims is necessary to fulfill the national forest purposes. The United States has shown sparse evidence to support its claim that instream flows serve the national forest purposes of watershed and timber protection.[35] It is

United States under the provisions of section 471 of this title, the orders for which shall be and remain in full force and effect, unsuspended and unrevoked, and all public lands that may hereafter be set aside and reserved as national forests under said section, shall be as far as practicable controlled and administered in accordance with the following provisions. *No national forest shall be established, except to improve and protect the forest within the boundaries, or for the purpose of securing favorable conditions of water flows, and to furnish a continuous supply of timber for the use and necessities of citizens of the United States;* but it is not the purpose or intent of these provisions, or of

said section, to authorize the inclusion therein of lands more valuable for the mineral therein, or for agricultural purposes, than for forest purposes."
16 U.S.C. § 475 (1976) (emphasis added).

**35.** The United States claims that it proved instream flows were necessary for watershed protections. One government witness stated that: "If you . . . let the stream dry up you wouldn't be fulfilling the purposes of the watershed protection." The argument that instream flows are necessary for timber protection was supported by a claim that "trees growing next to the creek . . . are going to get more water." None of these statements supports a claim that

more likely that Congress did not wish to enlarge the consumption of water arising on national forest lands by protecting minimum instream flows when it established the national forest system in 1897. *See* Bassman, *The 1897 Organic Act: A Historical Perspective,* 7 Nat. Resources Law. 503 (1974).

The Supreme Court in *United States v. New Mexico, supra,* emphasized that Congress intended to provide large quantities of water for the economic development of the West when it passed the Organic Act of 1897. *Id.,* 438 U.S. at 711–12, 98 S.Ct. at 3019–20. The national forest purposes in the Organic Act of 1897 are essentially non-consumptive. By the time national forest water is available for appropriation from streams or lakes, it has already serviced most of the national forest purposes. Congress intended that the remaining water was to be used for domestic and commercial purposes as allocated under state law. *See, e.g.,* 16 U.S.C. § 481 (1976).[36] Congress' goal of enhancing the quantity of water available to western appropriators would be

undercut by enlarging federal reserved rights to include minimum instream flows. 438 U.S. at 713, 98 S.Ct. at 3020.

Nowhere has the United States shown that without instream flows the purposes of the national forests would be defeated. On the contrary, congressional policies to further the economic development of the West would be frustrated if we were now to hold that the many private appropriators in the national forests must relinquish their long-utilized water rights to downstream appropriators so that the federal government can maintain unneeded minimum stream flows. Many public and private appropriators—cities, industries, farmers, and ranchers—have depended on water diversions from national forest lands high in the Rocky Mountains. Minimum flow rights would upset these long-held expectations in favor of junior appropriators downstream and outside the national forest reservations. We therefore find that the United States does not have an instream flow claim for reserved water rights in the national forests.[37]

the purposes of the Organic Act of 1897 can be fulfilled only by maintaining an instream minimum flow; nor do they demonstrate any congressional intent to expand federal reserved rights. *See also United States v. Alpine Land & Reservoir Co.,* 503 F.Supp. 877 (D.Nev.1980) (the federal government did not show a need for instream flow rights for 1897 Act purposes).

**36.** Congress was well aware of the water needs of western states when it enacted the Organic Act of 1897. Section 481 is an expression of that recognition:

" '[F]orests exert a most important regulating influence upon the flow of rivers, reducing floods and increasing the water supply in the low stages. The importance of their conservation on the mountainous watersheds which collect the scanty supply for the arid regions of North America can hardly be overstated. With the natural regimen of the streams replaced by destructive floods in the spring, and by dry beds in the months when the irrigating flow is most needed, the irrigation of wide areas now proposed will be impossible, and regions now supporting prosperous communities will become depopulated.' S.Doc. No. 105, 55th Cong., 1st Sess., 10 (1897)."

438 U.S. at 712, 98 S.Ct. at 3020. Recognition now of instream flow rights would upset long-

held appropriative rights in the national forests in favor of later appropriations downstream.

**37.** The water court also found that since the United States failed to claim any instream flow rights in its application for reserved rights in the national forests, no water rights could be awarded. The United States' application provides in part:

"The United States claims direct water rights, storage water rights, transportation rights and well rights for purposes which include, but are not limited to, the following: growth, management and production of a continuous supply of timber; . . . fire fighting and prevention; forest improvement and protection; . . . watershed protection and management and the securing of favorable conditions of water flows; . . . flood, soil and erosion control; preservation of scenic, aesthetic and other public values; and fish culture, conservation, habitat protection, and management. *With respect to the category of fish culture, conservation, habitat protection, and management, the United States claims the right to the maintenance of . . . continuous, uninterrupted flows of water and . . . minimum stream and lake levels. . . .*"

(Emphasis added.) The plain language of this application limits the assertion of instream flow rights to the "category of fish culture,

### 3. Multiple-Use Sustained-Yield Act of 1960

Counsel for the United States claims that the Multiple-Use Sustained-Yield Act of 1960, 16 U.S.C. §§ 528–31 (1976) (MUSYA), reserved additional water for the existing national forests with a 1960 priority date for recreational and wildlife conservation purposes. The master-referee concluded that MUSYA broadened the reservation purposes of existing national forests so that water sufficient to satisfy outdoor recreation, range, and fish and wildlife purposes was reserved. Subsequent to the master-referee's report, but prior to the water court's ruling, the United States Supreme Court decided *United States v. New Mexico,* 438 U.S. 696, 98 S.Ct. 3012, 57 L.Ed.2d 1052 (1978). The water court, relying on *New Mexico,* held that MUSYA reserved no additional water for the national forests, beyond that amount reserved in the Organic Act of 1897 establishing the forests. Thus, the federal government was awarded no water rights for maintenance of minimum stream flows and lake levels necessary for the MUSYA purposes. We agree with the water court's ruling that *New Mexico* forecloses any claims for reserved water rights based on MUSYA and, accordingly, affirm its decision.

The United States claims in these appeals that it never had the opportunity in *New Mexico* to argue that MUSYA effected an additional reservation of water with a 1960 priority date for existing national forest lands. Instead, MUSYA had been presented in *New Mexico* as support for the federal government's argument that Congress always intended broad purposes for national forests. The United States also takes the position that the MUSYA declaration in the majority opinion in *New Mexico* is dictum. That position is in accordance with the dissenting opinion in *New Mexico* which contended that the MUSYA issue was not argued on appeal and therefore could not be a basis for the Court's disposition.[38] Whether the MUSYA declaration in *New Mexico* technically is dictum is immaterial now; the majority opinion in *New Mexico* directly addressed the issue and we are bound by the pronouncement of the United States Supreme Court on this point.

MUSYA codified the long-standing practice that the national forests should be administered for the "greatest good of the greatest number in the long run."[39] Con-

---

conservation, habitat protection, and management."

We have held that water courts are limited to consideration of claims actually presented in applications for adjudication of water rights, *Town of DeBeque v. Enewold,* 199 Colo. 110, 606 P.2d 48 (1980); *Orchard City Irrigation District v. Whitten,* 146 Colo. 127, 361 P.2d 130 (1961), so that affected stream users have notice of potentially conflicting claims and are therefore in a position to protect their water rights. *Breckenridge v. Denver,* Colo., 620 P.2d 1048 (1980); *Stonewall Estates v. CF & I Steel,* 197 Colo. 255, 592 P.2d 1318 (1979). Congress and the United States Supreme Court have directed federal claimants to proceed under state law when applying for water rights. *See, e.g.,* The McCarran Amendment, 43 U.S.C. § 666 (1976); *United States v. District Court for Eagle County,* 401 U.S. 520, 91 S.Ct. 998, 28 L.Ed.2d 278 (1971); *United States v. District Court for Water Division No. 5,* 401 U.S. 527, 91 S.Ct. 1003, 28 L.Ed.2d 284 (1971). Because of our decision on instream flow rights we need not address whether the United States' applications were sufficiently explicit.

**38.** In the proceedings in the New Mexico lower courts, the special master found that an in-

stream flow of six cubic feet per second (cfs.) was necessary for purposes of fish preservation in the Gila National Forest. The New Mexico Supreme Court reversed and allowed no instream rights. Even after acknowledging that "fish purposes" were part of MUSYA purposes, 438 U.S. at 714, 98 S.Ct. at 3020, the United States Supreme Court refused to alter the New Mexico Supreme Court's holding and award instream flow rights for fish purposes with a 1960 priority date. The Supreme Court, therefore, found that MUSYA did not effect a reservation of water even in 1960. Otherwise, it could have remanded the case for further proceedings to determine if MUSYA granted water rights with a 1960 priority.

**39.** H.R.Rep. No. 1551, 86th Cong., 2d Sess. 4, *reprinted in* 1960 U.S.Code Cong. & Ad.News 2377, 2378. House Report No. 1551 went on to list four reasons for the adoption of the Multiple Use Sustained Yield Act:

"(1) There should be a statutory directive to administer the national forests under sustained yield; (2) there should be a similar directive to administer the national forests for multiple use; (3) all the renewable sur-

gress was convinced that modern principles of multiple use and sustained yield would lead to better management of public forest holdings. MUSYA was intended to provide authority for the forest service to broaden its forests management practices. *See* H.R. Rep. No. 1551, 86th Cong., 2d Sess. 3 (1960), U.S.Code Cong. & Admin.News 1960, p. 2377; *see generally* Coggins, *supra* note 5. Section 528 of MUSYA provides in part:

"[I]t is the policy of the Congress that national forests are established and shall be administered for outdoor recreation, range, timber, watershed, and wildlife and fish purposes. The purposes of this Act are declared to be supplemental to, but not in derogation of, the purposes for which the national forests were established as set forth in the Act of June 4, 1897."

16 U.S.C. § 528 (1976). Section 528 makes it obvious that Congress intended to expand the purposes for which the national forests are administered. Congress made it equally clear, however, that the 1897 Act purposes—securing favorable conditions of water flows and furnishing a continuous supply of timber—would not be expanded by the 1960 legislation.[40]

Against that statutory background, the United States Supreme Court held in *New Mexico* that Congress did not intend in enacting MUSYA to reserve water in existing national forests for the additional purposes there established:

"While we conclude that the Multiple-Use Sustained-Yield Act of 1960 was intended to broaden the purposes for which nation-

al forests had previously been administered, we agree that Congress did not intend to thereby expand the reserved rights of the United States.

\* \* \* \* \* \*

"Congress intended the national forests to be administered for broader purposes after 1960 but there is no indication that it believed the new purposes to be so crucial as to require a reservation of additional water. By reaffirming the primacy of a favorable stream flow, it indicated the opposite intent."

438 U.S. at 713–715, 98 S.Ct. at 3020–21 (footnotes omitted).

The Supreme Court based its conclusion on two factors. First, it found that Congress intended MUSYA only to supplement the original national forest purposes of timber protection and conservation of water flows. The additional MUSYA purposes were not to impair effectuation of the original purposes of the national forests. *See* 16 U.S.C. § 528. The Court concluded that if the MUSYA purposes were used as a basis for instream flow rights to the federal government, then a substantial amount of water would be lost for irrigation and domestic use. As a result, minimum flow rights for recreational or fish habitat purposes would be "in derogation of" the original national forest purposes of securing favorable conditions of water flow. 438 U.S. at 715, 98 S.Ct. at 3021. The Court was convinced that Congress intended to reserve water for the primary purposes of existing national forests (the Organic Act of 1897 purposes), but no water was reserved for

---

face resources for which the national forests are established and shall be administered should be named in a single statute; and (4) enactment would help to implement the program for the national forests sent to the Congress in March of 1959, and unanimously approved by this committee by a resolution adopted August 4, 1959."
*Id.* at 2378. The utilitarian focus of MUSYA was a continuation of federal policy that emphasized the economic and recreational uses of the public lands. *See* Coggins, *supra* note 5, at 232–43. Recent legislation has shifted to include an emphasis on non-economic values of the public lands. *See, e.g.,* The Wilderness Act of 1964, 16 U.S.C. §§ 1131–36 (1976).

**40.** The MUSYA legislation was a compromise bill designed to allow the Forest Service greater discretion in its management of the national forests. The "supplemental to, but not in derogation of" language was added to the Act by the House Committee on Agriculture, and has the effect of limiting the impact of the 1960 purposes as modifications of the 1897 purposes. *See* H.R.Rep. No. 1551, 86th Cong., 2d Sess. (1960); *see generally* Comment, *National Resources—National Forests—The Multiple Use-Sustained Yield Act of 1960,* 41 Or.L.Rev. 49 (1961).

secondary purposes added by MUSYA. *Id.*[41]

Second, the Supreme Court concluded that Congress intended to defer to state water law unless a clear contrary intent to reserve water could be found. Nothing in the legislative history or language of MUS-YA indicates any intent to reserve additional water. The Court was hesitant to expand a "doctrine built on implication" without strong legislative support. *Id.* Congress recognized the severe water shortages in the West and limited its reservation of water to the traditional national forest purposes. *Id.*

We are convinced that the "implied-reservation-of-water doctrine" must be narrowly construed. Additional federal water rights in Colorado may reduce water available to satisfy long-held adjudicated water rights, especially in streams which have been fully appropriated.[42] When Congress passed MUSYA, it was aware of the reserved rights doctrine. *See, e.g., Federal Power Commission v. Oregon,* 349 U.S. 435, 75 S.Ct. 832, 99 L.Ed. 1215 (1955); *Winters v. United States,* 207 U.S. 564, 28 S.Ct. 207, 52 L.Ed. 340 (1908); *United States v. Rio Grande Dam & Irrigation Co.,* 174 U.S. 690, 19 S.Ct. 770, 43 L.Ed. 1136 (1899). Congress, however, chose not to reserve additional water explicitly. In the face of its silence, we must assume that Congress intended the federal government to proceed like any other appropriator and to apply for or purchase water rights when there was a need for water. The federal government has the power to act in condemnation proceedings if its wishes to obtain water outside the state appropriation system for additional national forest purposes.[43]

Our reading of *United States v. New Mexico* and MUSYA is bolstered by the Department of the Interior's interpretation of the same case law and statutory materials. A recent Department of the Interior memorandum opinion interprets the reserved rights doctrine as we do:

> "The unavoidable conclusion to be reached from [the reserved rights] cases is that Congress gave the states broad power to provide for the administration of water rights which would only be limited where necessary to accomplish the original purpose of a congressionally mandated reservation or to protect the navigation servitude. As a result of this implicit grant of power, the presumption is that state law will control all non-reserved claims unless Congress provides otherwise. *If Congress wishes to abandon its historical practice of deference it must explicitly exercise its power.* While the Congress has retained the right to amend these laws and reassert legislative control over a portion or all of the remaining unappropriated water in a state, it has chosen not to do so. In construing land management statutes, *this deference to state law rises to a presumption that the United States and its agencies must acquire water rights in accordance with state substantive and procedural law unless necessary for the original purpose of a reservation."*

**41.** *See supra* note 31.

**42.** The Supreme Court was aware of the shortage of water in the West when it noted that "federal reserved water rights will frequently require a gallon-for-gallon reduction in the amount of water available for water-needy state and private appropriators. This reality has not escaped the attention of Congress and must be weighed in determining what, if any, water Congress reserved for use in the national forests." 438 U.S. at 705, 98 S.Ct. at 3016. The Court also stated that "[w]here water is only valuable for a secondary use of the reservation, however, there arises the contrary inference that Congress intended, consistent with its other views, that the United States would

acquire water in the same manner as any other public or private appropriator." *Id.* at 702, 98 S.Ct. at 3015.

**43.** Congress has in some instances required the federal government to purchase water rights. Under the Department of Agriculture Organic Act of 1944, 16 U.S.C. § 526 (1976), Congress authorized the appropriation of funds "for the investigation and establishment of water rights, including the purchase thereof or of lands or interests in land or rights-of-way for use and protection of water rights necessary or beneficial in connection with the administration and public use of the national forests." 438 U.S. at 703 n. 6, 98 S.Ct. at 3015 n. 6.

88 Interior Dec. 1055, 1064 (1981) (footnote omitted) (emphasis added). The interpretations of the Supreme Court and the Department of the Interior on the applicability of MUSYA to federal reserved water rights dictate the result. While we are sympathetic with the environmental, aesthetic, and recreational goals which prompted these requests for federal reserved water rights, we read *United States v. New Mexico, supra,* as dispositive of the claims of the United States.

We conclude therefore that MUSYA does not reserve additional water for outdoor recreation, wildlife, or fish purposes. We believe that Congress intended that the federal government proceed under state law in the same manner as any other public or private appropriator. Accordingly, we affirm the water court's determination.

### B. *Dinosaur National Monument*

#### 1. *Instream Flow Rights*

The United States claims that it has a reserved instream flow water right in the Yampa River for recreational boating within Dinosaur National Monument. It argues that recreational boating is a purpose for which national monuments are established and that an implied water right exists in an amount necessary to fulfill the purpose. The water court concluded that the establishment of Dinosaur National Monument did not reserve water to the federal government for recreational boating. The water court also held that an instream flow water right may exist to preserve fish habitats of historic or scientific interest; that question, however, must await determination of the specific purposes for which Dinosaur National Monument was established. We affirm the water court's conclusions with modifications.

National monuments may be created by presidential proclamation to preserve public lands of outstanding historic or scientific interest. 16 U.S.C. § 431 (1976). In 1915, President Wilson established Dinosaur National Monument on an eighty acre tract of Utah land for the purpose of preserving an "extraordinary deposit of Dinosaurian and other gigantic reptilian remains." Presidential Proclamation of Oct. 4, 1915, 39 Stat. 1752 (1915). In 1938, the Monument was expanded into Colorado to include canyon lands formed by the Yampa River. The 1938 proclamation noted the presence of objects of historic and scientific interest in its reservation of 200,000 Colorado acres. Moreover, the proclamation placed the Monument under the "supervision, management, and control" of the National Park Service. Presidential Proclamation of July 14, 1938, 53 Stat. 2454 (1938). In 1960, the Monument's boundaries were again slightly modified by Congress.

To ascertain if there is an implied reservation of waters for recreational boating, we must determine whether Congress intended to establish a recreational purpose when it established the Monument. The issue is particularly important in this context because of the enormous potential economic impact of minimum stream flows on vested and conditional Colorado water rights.[44] We do not believe that Congress intended to reserve water for recreational purposes under the legislation allowing for the creation of national monuments.

Dinosaur National Monument was originally established to preserve impressive prehistoric fossils. There is no question that the 1915 proclamation and the underlying legislation on which it is based, the American Antiquities Preservation Act of 1906, 16 U.S.C. §§ 431 *et seq.* (1976), were primarily concerned with scientific and historic purposes, not recreational purposes. *See, e.g.,* H.R.Rep. No. 11016, 59th Cong., 1st Sess.

44. Dinosaur National Monument is located at the lowest reaches of the Yampa River in Colorado. To find a reserved right to instream flow that far downstream would have a significant impact on numerous upstream users. The record shows that absolutely decreed water rights in the Yampa drainage above the Monument which are *junior* to the 1938 reservation date total about 1200 cfs. and 12,514 acre-feet, and conditionally decreed water rights total about 9500 cfs. and 1,900,000 acre-feet. Moreover, awarding the United States minimum flow rights would result in deliveries of water by Colorado to Utah in excess of the obligation specified in the Upper Colorado River Compact. Congress approved the Compact in 1949.

(1906) (national monuments have narrower purposes than national parks). The federal government argues, however, that the provisions in the 1938 proclamation, which place management of the Monument under the National Parks Service Act of 1916,[45] carries with it an implied reservation of water for purposes recognized under the 1916 Act. Purposes under the 1916 Act include the conservation and enjoyment of scenic, natural, and historic objects. The United States' argument places "recreational purposes" (including instream flows for river rafting) under the rubric of "enjoyment of scenic, natural, and historic objects."

We cannot accept the federal government's assertion that the National Park Service Act expands the purposes for which national monuments are granted reservations of water. Acceptance of this argument would mean that Congress has, *sub silentio,* eliminated all basic distinctions between national monuments and national parks. We are, in effect, asked to treat monuments as having the same recreational and aesthetic purposes as national parks. Our review of the statutory and legislative record convinces us that Congress intended national monuments to be more limited in scope and purpose than national parks.

Nothing in the National Park Service Act or its legislative history indicates any intent to modify the purposes for which national monuments are established under the Antiquities Act or expand the reserved water rights claimed for them. National monuments were included in the National Park Service Act for administrative purposes—to provide for their management by the National Park Service within the Department of the Interior, rather than by the Forest Service within the Department of Agriculture. *See* H.R.Rep. No. 700, 64th Cong., 1st Sess. (1916).

The Act itself acknowledges differences between the various components of the national park system. National parks and monuments are "interrelated," though not identical; each monument or park is "distinct in character." Although the areas are "cumulative expressions of a single national heritage" and are to be regulated consistently with the fundamental purposes expressed in the Act, the "values and purposes for which these various areas have been established" still control their administration. 16 U.S.C. §§ 1a–1, 1c (1976).[46] Thus, we must look to the purposes for which the monument was established, not to the purposes for which national parks were established, in determining the necessity for reserved water rights.

That conclusion is supported by United States Supreme Court precedent. In *Cappaert v. United States,* 426 U.S. 128, 96 S.Ct. 2062, 48 L.Ed.2d 523 (1976), the Court construed the availability of reserved water rights in a national monument—Devil's Hole National Monument. The Monument, like Dinosaur National Monument, was established by presidential proclamation pur-

---

**45.** The National Park Service Act of 1916, 16 U.S.C. § 1 (1976), provides:

"[T]he [National Park] [S]ervice ... shall promote and regulate the use of the Federal areas known as national parks, monuments, and reservations ... by such means and measures as conform to the fundamental purpose of the said parks, monuments, and reservations, *which purpose is to conserve the scenery and the natural and historic objects and the wild life therein and to provide for the enjoyment of the same* in such manner and by such means as will leave them unimpaired for the enjoyment of future generations."

(Emphasis added.)

**46.** The Antiquities Act of 1906, 16 U.S.C. § 431 (1976), gave the president authority to establish national monuments through presidential proclamations. However, only Congress has the authority to establish national parks. 16 U.S.C. §§ 21–410 (1976). Thus, the 1938 proclamation establishing Dinosaur National Monument did not establish park lands; it only vested management of the Monument with the Park Service.

While Congress did revise Dinosaur National Monument's boundaries in 1960, it rejected an opportunity—over the Department of the Interior's recommendation—to redesignate the area as a national park. *See* H.R.Rep. No. 1651, 86th Cong., 2d Sess. (1960); S.Rep. No. 1629, 86th Cong., 2d Sess. (1960). This underscores our belief that there remain fundamental differences between park lands and monument lands.

suant to the Antiquities Act of 1906, 16 U.S.C. § 431 (1976), and is also under the control of the National Park Service. The Court found an implied water reservation necessary to protect a rare desert fish based on the 1952 proclamation establishing the monument:

"Here the purpose of reserving Devil's Hole Monument is preservation of the pool. Devil's Hole was reserved 'for the preservation of the unusual features of scenic, scientific, and educational interest.' The Proclamation notes that the pool contains 'a peculiar race of desert fish ... which is found nowhere else in the world' and that the 'pool is of ... outstanding scientific importance....' *The pool need only be preserved, consistent with the intention expressed in the Proclamation, to the extent necessary to preserve its scientific interest.* The fish are one of the features of scientific interest. The preamble noting the scientific interest of the pool follows the preamble describing the fish as unique; the Proclamation must be read in its entirety. Thus, as the District Court has correctly determined, the level of the pool may be permitted to drop to the extent that the drop does not impair the scientific value of the pool as the natural habitat of the species sought to be preserved. The District Court thus tailored its injunction, very appropriately, to minimal need, curtailing pumping only to the extent necessary to preserve an adequate water level at Devil's Hole, thus implementing the stated objectives of the Proclamation."

426 U.S. at 141, 96 S.Ct. at 2070 (emphasis added). The Supreme Court analyzed the extent of reserved water rights based on the explicit purpose evidenced in the establishing proclamation and not based on the purposes found under the National Park Service Act. The same analysis must be used in determining reserved water rights for Dinosaur National Monument.

In *United States v. New Mexico, supra,* the Supreme Court further directs us to examine carefully the purpose for which federal land is withdrawn. Congress has conferred substantial responsibility for water resource allocation upon the states. 438 U.S. at 701–02, 98 S.Ct. at 3015. It would defeat that long-standing policy of congressional deference to state water determinations to interpret loosely federal reservations of scientific and historic lands. Further, the Court emphasized that Congress impliedly reserves "only that amount of water necessary to fulfill the purpose of the reservation, no more." *Id.* at 700, 98 S.Ct. at 3014, *quoting United States v. Cappaert,* 426 U.S. at 141, 96 S.Ct. at 2070. The excess water was left to public and private appropriators.

We believe that Dinosaur National Monument was established for the purpose of preserving outstanding objects of historic and scientific interest. Recreational boating is not a purpose for which the 1938 acreage was implicitly or explicitly reserved. The federal government therefore is not entitled to a reserved water right for minimum stream flows in the Yampa River through Dinosaur National Monument for recreational purposes.

The water court expressed a willingness to grant some stream flows for the purpose of preserving fish habitats of historic and scientific interest. It rested its conclusions on the language of 16 U.S.C. § 1 which states that conservation of "wildlife" is a purpose for which national monuments will be administered. *See supra* note 45. As we have discussed above, the National Park Service Act should not be used as a basis for expanding the monument purposes which support a reservation of water. In our view, the relevant reservation document is the presidential proclamation of 1938, which enlarged Dinosaur National Monument to protect "objects of historic and scientific interest." 53 Stat. 2454 (1938). However, the water court was correct in ordering the master-referee to determine whether the 1938 proclamation intended to reserve water for fish habitats of endangered species of historic and scientific interest, and if so, to quantify the minimal amount of water necessary to fulfill that purpose. We therefore remand to the water court for further proceedings on the issue of fish habitats.

## 2. *Quantification*

■ The federal government appeals the water court's determination that quantification of the amount of instream water which is necessary for Monument purposes must be concluded within six months following a final decree in this case. We do not think that six months is an unreasonable period for the federal government to quantify its water rights, especially in view of our decision to remand the issue of rights to instream flow for fish habitat purposes. Six months is ample time for the United States to quantify its water needs for protecting endangered fish species in the Yampa River. If unexpected difficulties arise during quantification, the federal government may seek an extension of time from the water court.

There are important considerations for finishing this litigation as expeditiously as possible. This case began in 1967. Since 1971, the federal government has known of its obligation to quantify reserved water rights. *United States v. District Court for Eagle County,* 401 U.S. 520, 91 S.Ct. 998, 28 L.Ed.2d 278 (1971); *United States v. District Court for Water Division No. 5,* 401 U.S. 527, 91 S.Ct. 1003, 28 L.Ed.2d 284 (1971). The tremendous uncertainty that minimum flow rights will inject into the existing state appropriation scheme makes any further delay unjustifiable. Holders of decreed and conditional water rights cannot plan or develop sizeable water projects until they are certain of the extent of the federal government's claims. Moreover, the limited purposes for which water must be quantified and the need to quantify only a single stream in Dinosaur National Monument support the water court's six month quantification period. We believe that the expeditious resolution of this issue will best serve the interests of all parties affected by this litigation.

### C. *Rocky Mountain National Park*

■ Rocky Mountain National Park was created from previously reserved national forest lands which were transferred to the Park in 1915 and again in 1930. The water court held that the priority date of any reserved water rights for Rocky Mountain National Park was the date on which the national forest lands were transferred to national park status. The United States argues that, for reservation purposes common to national forest lands and national park lands, the priority dates should be fixed by the dates of the initial national forest reservation. We agree that the earlier date is the proper benchmark.

The lands reserved for national parks have purposes consistent with the lands reserved for national forests. National parks exist for the purposes of protecting watershed and timber resources (also the national forest purposes), in addition to broader purposes of, *inter alia,* conserving scenery, historic and scientific objects, and wildlife. *See* National Park Service Act of 1916, 16 U.S.C. § 1 (1976). The purposes for which the national forests are administered were not rescinded by the simple reclassification of the lands. The reclassification changes the status of the lands from national forests to national parks, but the original purposes of timber and watershed protection continue even though the land is placed under National Park Service administration. There is no reason to believe that the transferral of national forest lands extinguishes the purposes of timber and watershed protection established by the Organic Act of 1897. Therefore, to the extent that the purposes of the national forests and national parks overlap, the federal government has reserved water rights in the amount minimally necessary to effectuate the purposes of the national forest lands. *See United States v. New Mexico, supra; Cappaert v. United States, supra.* Reservation of water for other purposes, however, will have a priority date from the time the national park was established.

The water court has decreed various water rights in Rocky Mountain National Park with priority dates of 1915 and 1930. The water court must reexamine its decree and award the United States water rights sufficient to meet the purposes of watershed and timber resources protection with a priority date based on the date the transfer-

red lands were reserved to the national forests.

#### D. *Public Springs and Waterholes*

■ The federal government claims on appeal that it has a reserved water right for the entire yield of all waterholes and springs, whether tributary or nontributary, which are located on lands withdrawn from the public domain by a 1926 executive order entitled "Public Water Reserve No. 107." The water court ruled that Public Water Reserve No. 107 reserved water rights limited to an amount necessary for stockwatering and drinking uses from nontributary springs or waterholes and that the United States has four years to quantify those rights. We affirm the water court's ruling subject to several modifications.

■ The extent of the federal government's reserved water rights for public springs and waterholes is determined from the reserving documents. *Cappaert v. United States, supra.* The over 1,500 springs and water holes involved in this litigation were reserved by executive order issued in 1926 pursuant to section 10 of the Stock Raising Homestead Act of 1916. 43 U.S.C. § 300 (1976).[47] The executive order, Public Water Reserve No. 107, provides:

"Every smallest legal subdivision of public land surveys which is vacant, unappropriated, unreserved public land and contains a spring or waterhole and all land within one quarter of a mile of every

spring or waterhole, located on unsurveyed public land, be and the same is hereby withdrawn from settlement, location, sale or entry, and reserved for public use in accordance with the provisions of Section 10 of the Act of December 29, 1916".

That executive order does not expressly state an intention to reserve water in public springs or waterholes and to withdraw it from appropriation under state law. *Cf. Cappaert v. United States, supra* (express reservation of water pool by proclamation). The water court, however, found that subsequent Department of the Interior regulations enacted pursuant to 43 U.S.C. § 300 reserved an amount of water minimally necessary to "prevent the monopolization of vast land areas in the arid states by providing a source of drinking water for animal and human consumption."

We agree that the federal government has reserved rights to provide a watering supply for animal and human consumption. The Stock Raising Homestead Act of 1916 gave the Department of the Interior authority to regulate public springs and waterholes so that no person could monopolize or control vast areas of western land by homesteading the only available water supply.[48] Regulations later enacted by the Department of the Interior recognized the limited domestic drinking and stockwatering

---

**47.** 43 U.S.C. § 300 (section 10 of the Stock Raising Homestead Act) grants the president authority to withdraw lands pursuant to the Pickett Act, 43 U.S.C. § 141 (1976) (first passed in 1910). Section 141 provides:

"The President may, at any time in his discretion, temporarily withdraw from settlement, location, sale, or entry any of the public lands of the United States, including Alaska, and reserve the same for water-power sites, irrigation, classification of lands, or other public purposes to be specified in the orders of withdrawals, and such withdrawals or reservations shall remain in force until revoked by him or by an Act of Congress." Sections 300 and 141 were repealed in 1976 by the Federal Land Management Act (FLPMA), 43 U.S.C. §§ 1701 *et seq.* (1970). The Act provides, however, that all withdrawals in force on the date of enactment of FLPMA re-

main in force until specifically changed in accordance with FLPMA.

**48.** The legislative history of the Act consistently emphasizes the limited watering purposes of the reservations. For example, the committee report on the Act stated that:

"This is a new section and authorizes the Secretary of the Interior to withdraw from entry and hold open for the general use of the public, important water holes, springs, and other bodies of water that are necessary for large surrounding tracts of country, so that *a person cannot monopolize or control a large territory by locating as a homestead the only available water supply for stock in that vicinity.*"

H.R.Rep. No. 35, 64th Cong., 1st Sess. 18 (1916) (emphasis added). Nowhere is there any support for the United States' claims of water for broad public uses.

purposes of the 1926 reservation.[49] It is also significant that the Department of the Interior, under the legislation providing for public water reserves, construed its authority as only granting control of *access* to the lands withdrawn.[50] The law of prior appropriation still governs the allocation of excess waters. It appears to us that the reservation documents indicate no intent to reserve the entire yield of public springs and waterholes involved here. Nothing in the statute or its legislative history indicates a congressional intent to open public springs and waterholes to the many public uses which the United States is now claiming.

■■■ The federal government's assertion, therefore, that the entire yield must be reserved is not well-founded. The purpose of the reservation was to prevent monopolization of water needed for domestic and stock watering purposes. The water court correctly ruled that the federal purposes could be satisfied with a quantifiable amount less than the entire yield of the springs and waterholes. The reserved rights doctrine only takes that amount of water "necessary to fulfill the purpose of the reservation, no more." 426 U.S. at 141, 96 S.Ct. at 2070. Here, as the water court

found, the necessary amount is less than the entire yield. Reserved water from public springs and waterholes is available for the purposes of human and animal consumption in the amount necessary to prevent monopolization of the water resources. We conclude that the water court has properly decreed sufficient water rights, subject to quantification, minimally necessary to fulfill those purposes of the reservations.

The language of Public Water Reserve No. 107 expressly reserves every tract containing a spring or waterhole. The water court limited that reservation to non-tributary waterholes and springs. We are aware that seepage from springs and waterholes on public lands makes an important contribution to the flow of natural streams which are subject to appropriation. However, the reservation documents fail to distinguish between tributary and non-tributary spring waters. The focus of Public Water Reserve No. 107 was on the surface manifestation of spring water, not on fine hydrological distinctions of tributariness. There is also nothing in the statute or the legislative history which would support the water court's exclusion of tributary water. Such a conclusion is likely to frustrate the legislative purpose of preventing monopolization

---

**49.** The Department of the Interior's most recent pronouncement on springs and waterholes is codified in 43 C.F.R. § 2311.0–3(a)(2) (1980):

> "2. *Purpose of withdrawal.* The Executive order of April 17, 1926, was designed to preserve for general public use and benefit unreserved public lands containing water holes or other bodies of water needed or used by the public for watering purposes. It is not therefore to be construed as applying to or reserving from homestead or other entry lands having small springs or water holes affording only enough water for the use of one family and its domestic animals. It withdraws those springs and water holes capable of providing enough water for general use for *watering* purposes."

(Emphasis added.) The language of that regulation emphasizes the watering purposes of the Act. The regulation indicates an intention to expand the water available to all members of the stockwatering and drinking public but not to reserve *all* spring water for *any* public purpose.

**50.** In an opinion issued contemporaneously with the legislation, the Assistant Secretary of the Department of the Interior stated:

> "There is in the withdrawal of these lands nothing which prevents any person filing such an appropriation under the laws of Utah at any time. If, however, such an appropriator shall seek to fence the land, or to erect structures thereon which would prevent the public from continued free access to all parts of it, he would be exceeding the rights which could be granted him under State law and would become a trespasser on the public lands of the United States. . . . It has been shown that continued access to water is essential to the use of the public range in common. This can only be insured by the retention in public ownership of the lands on which the water is situated so that they may not be fenced and the public excluded therefrom."

State of Utah, 45 Pub.Lands Dec. 551, 554 (1916).

and control of arid western land.[51] Monopolization of public waterhole or spring waters is prevented when no one appropriator has complete control of the resource. Any amount in excess of the amount needed to prevent monopolization is not reserved water. The water court reasonably concluded that the federal purpose was satisfied under its decree.[52] We therefore modify the water court's ruling to include those springs or waterholes reserved under Public Water Reserve No. 107 which are tributary to natural streams.

The federal government, claiming it cannot quantify its minimal needs for waterhole and spring waters within the four-year time period granted by the water court, seeks a one year extension of that period. The record reflects no evidence to support a claim that the federal government will be unable to accomplish quantification within four years. As we discussed above, *see supra* Part C, subsection 2, the United States has had notice of its obligation to quantify since 1971. There appear to be no insuperable obstacles to the government's accomplishment of that task. Should unforeseen difficulties arise during quantification, the federal government may request an extension of time from the water court. Accordingly, we do not disturb the water court's ruling on that issue.

### E. *Mineral Hot Springs*

The water court granted the federal government reserved water rights for use in connection with hot springs withdrawn pursuant to the Pickett Act, 43 U.S.C. § 141 (1976). *See supra* note 47.

The water court awarded reserved water rights to the hot springs for leasing purposes pursuant to 43 U.S.C. § 971 but ruled that power production was not a purpose of the reservation.[53] On appeal, the federal government claims that it additionally has a right to make use of water from mineral hot springs for geothermal power production purposes under the Geothermal Steam Act of 1970, 30 U.S.C. §§ 1001 *et seq.* (1976). We do not find any reserved water right for geothermal power production under the Geothermal Steam Act of 1970 and therefore affirm the water court's ruling.

In essence, the United States claims that the Geothermal Steam Act reserved geothermal water resources in all federal lands subject to the Act with a 1970 appropriation date. The Geothermal Steam Act, however, is principally a leasing statute and is not a reservation of water for energy production purposes. Section 1002 of the Act provides:

"Subject to the provisions of section 1014 of this title, the Secretary of the Interior may issue leases for the development and utilization of geothermal steam and associated geothermal resources (1) in lands administered by him, including public, withdrawn, and acquired lands, (2) in any national forest or other lands administered by the Department of Agriculture through the Forest Service, including public, withdrawn, and acquired lands, and (3) in lands which have been conveyed by the United States subject to a reservation to the United States of the geothermal steam and associated geothermal resources therein."

---

**51.** *Compare Hyrup v. Kleppe,* 406 F.Supp. 214 (D.Colo.1976), which held that tributary waterholes are not within the scope of Public Water Reserve No. 107. We are convinced that nothing in the presidential proclamation supports that conclusion of *Hyrup.* However, our opinion today in no way affects the federal district court's disposition.

**52.** We are thus not prepared to say that the reservation purpose is "entirely defeated" unless the government controls 100% of the water. It is a factual question as to what quantity of water meets the minimal necessity of the federal reservation. *See United States v. New Mexico, supra.*

**53.** The reserving act, 43 U.S.C. § 971 (1976), provides for the use of public springs:

"The Secretary of the Interior, upon such terms and under such regulations as he may deem proper, may permit responsible persons or associations to use and occupy, for the erection of bathhouses, hotels, or other improvements for the accommodation of the public, suitable spaces or tracts of land near or adjacent to mineral, medicinal, or other springs which are located upon unreserved public lands or public lands which have been withdrawn for the protection of such springs...."

The Act was primarily a response to the Department of the Interior's concern that it had no authority to dispose of geothermal resources on public lands. *See* H.R.Rep. No. 1544, 91st Cong., 2d Sess., *reprinted in* 1970 U.S.Code Cong. & Ad.News 5113, 5115.

No express or implied purpose to reserve water for the development of geothermal resources appears in the Act. Instead, Congress provided that leases issued pursuant to the Act should not conflict with the primary purposes for which the public lands were reserved.[54] It is reasonable to conclude that state appropriation law should govern until the United States has actually leased the geothermal resource. It is also significant that the federal government has complete control over access to federally held geothermal resources and can therefore fully regulate water appropriation. *Utah Power & Light Co. v. United States,* 243 U.S. 389, 37 S.Ct. 387, 61 L.Ed. 791 (1917); *Snyder v. Colorado Gold Dredging Co.,* 181 F. 62 (D.Colo.1910).

We conclude that the Geothermal Steam Act of 1970 provides for the leasing of federal lands for geothermal energy production. We do not find that any reservation of water was implied by Congress or is necessary to accomplish the purposes of the Act.

### F. *Administrative Aspects of Reserved Rights Doctrine*

1. *Federal Permittees, Licensees, Concessionaires*

■ The water court ruled that adjudicated reserved rights could not be used by any permittee, licensee, or concessionaire of the federal government. We see no reason why the federal government cannot control the disposition of reserved water through private contractors and therefore reverse the water court's ruling.

The purposes for which water was reserved must be determined by reference to the various documents creating the reserva-

tion, statutes, and case law. *United States v. New Mexico, supra.* The only limitation properly placed upon use of reserved waters is that the water be used only for reservation purposes and in amounts necessary to fulfill those purposes. *Id.* The 1916 National Park Organic Act, 16 U.S.C. §§ 1 *et seq.* (1976), allows for permit and lease agreements to augment the usage and accessibility of public lands. There is no reason why the federal government should be forced to abandon a proven, efficient, and congressionally-sanctioned system employing private contractors and instead hire government employees to perform the same functions. Of course, use of a federal water right pursuant to a lease, license, permit, concession, or other agreement will not enlarge that right in any way.

Accordingly, we modify the water court's order to permit the federal government to fulfill reservation purposes by use of private contractors.

### 2. *Non-Use by the Federal Government*

■ The water court ruled that the federal government must make a quadrennial showing of its progress in applying reserved water not currently in use. The United States argued on appeal that the ruling could cause it to lose reserved rights. We do not believe the water court intended to cause the forfeiture of federal reserved claims if the United States failed to use reasonable diligence in developing its proposed appropriation. *See* section 37–92–301(4), C.R.S.1973 (conditional water rights must be reduced to absolute decrees in a reasonably diligent fashion). Federal reserved water rights are immune from Colorado's non-use requirement to the extent necessary to fulfill the purposes of the reservation. *United States v. New Mexico, supra. See also United States v. California,* 332 U.S. 19, 67 S.Ct. 1658, 91 L.Ed. 1889 (1947). Once the federal right has been quantified, that amount is then outside the

---

**54.** Geothermal leasing is further limited by 30 U.S.C. § 1014 (1976), which provides:

"Geothermal leases for lands withdrawn or acquired in aid of functions of the Department of the Interior may be issued only un-

der such terms and conditions as the Secretary may prescribe to insure adequate utilization of the lands for the purposes for which they were withdrawn or acquired."

state appropriation system. It is reasonable, however, to require the United States to appear quadrennially to report its progress in applying reserved water to beneficial use.

### 3. *Appurtenant Lands*

The water court restricted the water source for reserved water rights decreed to accomplish the purposes of particular land reservations to waters on, under, or touching the reserved lands. The federal government argues that there may be circumstances in which water not adjacent to a reservation could be reserved and in which off-reservation use of waters flowing on a reservation may be justified. These issues are presently hypothetical. We decline to resolve them in a case where there has not been a specific factual claim presenting an actual case or controversy. We are aware that a pending case involving naval oil shale reserves presents these issues in a proper factual context and will reserve our judgment accordingly. *See In the Matter of the Application for Water Rights of the United States of America,* No. W467 (Water Div. No. 5 filed Dec. 31, 1971).

### 4. *Priority of Perfected Water Rights*

The federal government argues that federal reserved rights are junior only to prior properly adjudicated water rights. It is true that *Cappaert v. United States, supra,* held that the federal government has a right only to unappropriated water at the time of the reservation. 426 U.S. at 138, 96 S.Ct. at 2069. State law determines what water is "unappropriated." At this time, however, there are no parties before this court who have claimed water rights in conflict with the federal government's priority. We will resolve such a conflict when it arises.

### 5. *Change of Use*

The federal government agrees with the water court that it must follow Colorado law when and if it seeks a change of use or change of point of diversion for reserved water rights. It objects, however, to the water court's ruling that no future change of use shall be granted unless the change

effectuates a valid reservation purpose. At this time the United States has made no application for a change of use and we therefore decline to decide the issue until it has been properly brought up on appeal.

### 6. *State Administration*

The United States has stipulated that it agrees to water court determination of federal reserved water rights. That position comports with the McCarran Amendment, 43 U.S.C. § 666 (1976), and *United States v. District Court for Eagle County, supra.* Additionally, it agrees that water rights ultimately adjudicated to it are subject to administration by the State Engineer.

### 7. *Omitted Claims*

The federal government argues that the water court improperly refused to consider certain omitted reserved and appropriative claims. We agree with the water court's conclusion that it lacked jurisdiction to consider the claims until the United States had filed proper applications which will give notice to potential objectors. *Breckenridge v. Denver,* Colo., 620 P.2d 1048 (1980). The United States is free to file a new application and prove the factual basis for the claims.

### SUMMARY

The following is a partial summary of our conclusions. Included are directions for the water court on remand.

### A. *National Forests*

1. We *reverse* the water court's ruling interpreting 16 U.S.C. § 481 and *remand* for a determination of the federal government's needs to fulfill the national forest purposes of timber and watershed protection.

2. We *affirm* the water court's conclusion that the federal government has not claimed or proved instream flow rights necessary to satisfy national forest purposes.

3. We *affirm* the water court's determination that the Multiple-Use Sustained Yield Act of 1960 reserved no additional waters in the national forests for outdoor recreation, wildlife, or fish purposes.

B. *National Monuments*

1. We *affirm* the water court's ruling that there is no instream flow water right for recreation boating in Dinosaur National Monument. We *remand* for a determination of whether the reservation purpose of the Monument includes preservation of fish habitats.

2. We *affirm* the water court's determination that gives the federal government six months to quantify its water claims in Dinosaur National Monument.

C. *National Parks*

We *reverse* the water court's determination that priority dates in Rocky Mountain National Park are based on the time of transfer from national forest status to national park status. The earlier priority date is proper for water used to fulfill the original national forest purposes.

D. *Public Springs and Waterholes*

We *affirm* the water court's ruling that reserved water rights exist for public springs and waterholes for the purposes of preventing the monopolization of water needed for domestic and stockwatering purposes. We *remand* for modification of that aspect of the ruling which excludes tributary waters from the reservation.

E. *Mineral Hot Springs*

We *affirm* the water court's conclusion that the Geothermal Steam Act of 1970, 43 U.S.C. §§ 1001 et seq. (1976), does not reserve water for purposes of power production.

CONCLUSION

These appeals are the culmination of fifteen years of adjudication. Even so, not all of the complicated and important issues presented us can be resolved by this opinion. The resolution and integration of state and federal water claims are of utmost importance to the western states and the water courts of Colorado have done an admirable job in reducing theoretical claims to definite water rights. We believe that the results reached in this case comport with controlling federal and state law and provide the foundation for a system of water rights adjudications which will preserve the legitimate economic and environmental needs of both sovereigns. Final proceedings based on this opinion should eliminate much of the uncertainty surrounding Colorado's appropriation system and allow for rational and comprehensive long-range planning by state and federal water users.

The decree of the district court is affirmed in part and reversed in part. The case is remanded for modification of the decree and supplemental proceedings in conformity with this opinion.